WILLIFORD CARTWRIGHT v. PINK CARTWRIGHT.

Under the laws in force in this country as well before as since the year 1840, the slaves owned by the husband or wife before marriage, remained his or her separate property ; and the children of such slaves, born after the marriage, were and are the separate property of the owner of the mother.

Error from Montgomery. Tried below before the Hon. Peter W. Gray.

Suit by defendant in error against plaintiff in error, for divorce, commenced August 24th, 1853. Plaintiff and defendant were married in what is now Montgomery county in this State, in 1834. The defendant owned, before marriage, a slave, Jane, and her child, Mary. Each of the parties also owned a few cattle, hogs, &c. Since then, there had been born of the said Jane, and were still living and in possession of defendant, Tamer, aged 18 years ; Harriet, aged 16 years ; Sarah, aged 14 years ; Clarissa, aged 11 years ; of the girl Mary, a child two years old, and another, an infant. There was a league and labor of land, the headright of defendant, some other land, cattle and horses, admitted to be common property, unless the

Cartwright v. Cartwright.

plaintiff's right thereto were defeated by a plea which defendant filed, that the plaintiff had been married to one James Bird, in the State of Alabama, in 1827, and was his lawful wife at the time of her putative marriage to defendant, wherefore defendant prayed that his marriage with plaintiff be declared null, &c. There were several children, the last of whom was born in 1848.

The grounds of divorce were that defendant in 1848 falsely accused plaintiff of infidelity to the marriage vow, denied the paternity of the child born in 1848, abandoned the bed and board of plaintiff, and lived in improper intimacy with the negress Jane, &c., &c.

Special issues were submitted to the jury, under the direction of the Court; all of which were found in favor of the plaintiff. The Court thereupon decreed a divorce, as prayed by plaintiff; assigned the slaves Jane and Mary to the defend, ant, but decreed that their children should be equally divided between the plaintiff and defendant, with the other common property, &c.

*L. L. Bradbury* and *H. N. & M. M. Potter*, for plaintiff in error.

*N. H. Davis*, for defendant in error.

HEMPHILL, CH. J. I shall examine, first, the main question in this case, and that is, whether, under the Laws of Spain, in force at the time of the marriage, the children born since the marriage, of female slaves, who were the separate property of the husband, became a portion of the community, or were the separate property of the husband.

It is a principle of the Roman and Spanish Law, and has been engrafted on the Law of Slavery as it exists in the United

States, that the children of a female slave follow the condition of their mother; they consequently become slaves, and belong to the owner of the mother. It is also a principle of the Spanish, as well as of the Common Law, that ownership or property in a thing gives the right to enjoy and dispose of it freely, so far as it may not be prohibited or opposed by the law ; (L. 27, Tit 2, L. 1, Tit. 28, Part 3 ; L. 10, Tit. 33, Part. 7 ; and that ownership of a thing gives a right to everything. which it produces, or is incorporated with it by accession, whether it be by the work of nature or by that of our own hands. (Escriche *verbo* " PROPRIEDAD."

Ownership, or dominion, is of two kinds—perfect and imperfect. We have seen that perfect ownershiship includes the *jus desponendi*, of receiving the fruits of every description produced by the thing directly or indirectly. Of imperfect ownership, we shall refer only to the usufructuary right, and it will be seen that it is of importance that the right of the usufructuary, under the Spanish Law, should be fully understood, as it is conceived, there is a striking analogy between the relation which he bears to the owner of the property, and that which the community bears to either the husband or wife, as the owner of separate property.

Usufruct is defined by Escriche, as the right of using and enjoying, and receiving the profits of, property which belongs to another ; and a usufructuary is one who has the usufruct or right of enjoying anything in which he has no property. The usufructuary has a right to all the fruits produced by the subject of usufruct, whether they be natural, that is, produced spontaneously by the earth or animals, as timber, herbs, fruits, wool, milk, and the young of cattle ; or industrial, that is, produced by cultivation, as crops of grain, &c. ; or civil, viz : rents, as the hire or rents of houses, freights, revenues from annuities, &c., and from other effects or rights. (Escriche, *verbo* USUFRUCTUARIO.)

But notwithstanding these enlarged rights of the usufruc-

tuary owner, to the produce or fruits of the subject of usu-
fruct, yet there is one exception, viz : the child born of a slave-
of whom one has the usufruct, shall belong to the master of the
slave and not to the usufructuary. Law 23, Tit. 31, Partidas
3d, is to the effect, that when a man has a right to the usufruct
or labor of a slave of another, he will acquire all the slave
gains by his manual labor, or by means of funds belonging
to the usufructuary. But the gains made by a slave, from
what was given or left him by will, belong exclusively to
his master, unless the donation or legacy was made with the
intention that they should belong to the usufractuary. or he
who enjoyed the use of a slave ; in which case they will ac-
quire the property therein. We likewise say that notwith-
standing a child be born of a slave, of whom one had the usu-
fruct, and while the mother was in the power of the usufructu-
ary, such child will belong to the master of the slave, unless
he had expressly agreed that the usufructuary should have
it.

As the claim of the community to the children of a female
slave, the separate property of one of the partners. is deduced
from the rule that the community is entitled to the fruits of the
separate property of each partner, I will examine in this
place, whether either in Roman or Spanish Law, the increase
of slaves was regarded as a portion of the fruits of usufructu-
ary property, or whether they were not expressly reserved for
the owner in every provision in which the issue of slaves was
mentioned in connection with the other fruits of property held
in usufruct. In the Institutes of Justinian. Lib. 11, Tit. 1,
Sec. 37, which treats, in connection with the two foregoing
Sections, of the right of the usufructuary possessor to the
fruits of the property, it is said that among the fruits or pro-
duce of animals we not only reckon milk, skins and wool, but
also their young, and therefore lambs, kids, calves, colts and
pigs appertain, by nutural right, to the usufructuary ; but the
offspring of a female slave cannot be thus considered, but be-

longs to the proprietor of such slave. (Cooper's Justinian, p. 83.)

We may refer, also, to the usufructuary right which the husband has in the *dote*, or dowry, brought by the wife, under some contract to support with its fruits the charges of the matrimony, as there is a striking analogy between the rights of the husband to the fruits of this property, and the rights of the community to the fruits of the separate property of husband or wife.

During the marriage, the husband has the exclusive administration of the property brought in dowry by the wife, whether it be brought in with or without appraisement, and the right to receive all its fruits, natural, industrial or civil, to maintain with them his wife, children and family. (Escriche, *verbo* Dote.) This author enumerates these fruits in detail, among which are the profits acquired by the industry of slaves, but there are excepted from the fruits to be received by the husband, the donations or legacies made to slaves, and the children of the female slaves. These consequently will belong to the wife, who is the owner, and not the husband, who has only the usufructuary right in the dowry. In Part. 4, Tit. 11, Law 20, it is said : "As it sometimes happens that women give fe-"male slaves in dowry to their husbands, we shall therefore "speak of them in this place ; and we say that if a wife give a "female slave to her husband, appraising her value at the time, "and the husband promises to give her the amount of the ap-"praisement of such slave when the marriage comes to be dis-"solved by death or a judgment of the Court ; in that case the "profit or loss happening on account of the slave, will be for "the husband. And so if the slave should have children, they "will also belong to the husband ; but if the husband takes upon "himself the risk of the decrease of value only of the slave ; "and not of her death, or the risk of her death, and not of the "decrease of her value, in that case, although the slave had been "appraised, the child or children, born of her, will not belong

" to the husband, but to the wife ; and if the wife had not given " the slave to her huband with the appraisement of her value, " then the profit or loss arising from such slave, will be for the " wife and not for the husband." In Law 25th of same title, it is said, " Three things are necessary for the husband, in or- " der that he may acquire the fruits of the dowry given him by " his wife. The first is, that the marriage be contracted, the " second that he be put in possession of the dowry, the third that " he sustain the burthen of the marriage, in supplying his own " wants and those of his wife, children, and the rest of the fam- " ily. These three things concurring in favor of the husband, " he ought to have the fruits of the dowry given to him by the " wife, whether its value had been appraised or not, save what " is said in the law which spoke of the children of a slave " which had been given in dowry, where it is said they ought " not to belong to the husband unless he had taken upon him- " self the risk of the deterioration and death of the slave, nor " ought the husband to have the gains acquired by that, or any " slave given to him by his wife in dowry, if such gains arise " from a donation made to the slave by any one, or from a leg- " acy left to him by will ; but whatever the slave may acquire " by manual labor, or with the money of the husband, such " gains as these will belong to the husband and not to the wife ; " and what we here say of slaves applies where the husband "had not taken with an appraisement of value, nor taken upon " himself the risk of their deterioration and death." (Moreau & Carleton, Partidas, Vol. 1, 527, 533.)

To show further, that as a general rule, in both Roman and Spanish Laws, the increase of slaves were not regarded as fruits belonging to the usufructuary possessor of the mother, as were the increase of animals, viz : lambs, kids, calves, &c., I will refer to the learned treatise of Lagunez, *De Fructibus*, or in relation to fruits and fructuary property. In Chapter 8th, first part, he discusses with great fullness, the question whether the issue of female slaves can be regarded as fruits, and to some

extent whether they may not be considered as revenue (*in red-
ditu.*)

The author states this to be a very ancient question between
the distinguished ancient jurists, viz : J. C. Brutus, Manilius,
and Scaevola ; that Scaevola and Manilius were of the opinion
that the young of female slaves should be regarded as fruits ;
but that Brutus dissented, and his opinion has obtained from
that time, and has been received by all jurisconsults in other
systems of jurisprudence. The author examines at some length
this resolution of Brutus ; offers some reasons, and cites some
authorities, in support of the opposite opinion of Scaevola and
Manilius ; as for instance, the response of Paulus to the ques-
tion, where an heir was bound after his death to restore
the inheritánce to another, but without any of the profits,
whether children of a female slave, born during the life estate
of the heir, would go to his heirs or to the *fidei commissary
heir*, that is to the remainder man ; and he answered they
would go to his heirs, viz : the heirs of the tenant of the life
estate ; and he cites other instances in favor of including the
increase of slaves among the general mass of fruits, or, at
least profits, of an usufructuary estate ; but he admits that not-
withstanding these grounds, the opposite opinion of Brutus
prevailed ; that Ulpian and Papinian gave responses in direct
opposition to that of Paulus ; and these were to the effect, that
the increase of slaves would not belong to the tenant for life,
though he was entitled, in general terms, to the profits accru-
ing from the estate during his life ; that Justinian adopted
this opinion of Brutus in Sec. 37, Lib. 11, Tit. 1, of his Insti-
tutes, which has been cited above ; that it was followed by
jurisconsults, and was recognized in the Partidas L. 23, Tit.
31, Part. 3, cited above.

The reasons given by the ancients for the distinction be-
tween the increase of slaves and those of animals and other
fruits, was, that it seemed absurd that man should be enumer-
ated as a " fruit," or an article of produce, since for his use

nature hath furnished all kinds of produce ; and that slaves
were not procured that they might beget children, but that
they should perform service.   The special reasons which may
have influenced the ancients, in the adoption of a rule, are now
of but little consequence.   The point for inquiry is, whether
the rule has continued in force, and is adapted to the present
condition and wants of society.   The author refers to the dis-
tinctions taken, or attempted to be taken, between " fructus "
and " redditus ;" that though the increase of slaves might not
come under the denomination of " fructus," yet they might be
classed as "redditus," that is, profits or revenues ; that the
response of Paulus favored such distinction, but that the opin-
ion of Papinian, as shown by his response, was the very oppo-
site.   Some deductions are drawn by him from the general
rule that the increase of slaves cannot be computed as fruits,
and he refers to several commentators, and to Law 20, Tit. 11,
Part 4th, cited above, to the effect that the increase of a *dotal*
slave, where there was no appraisement of the *dote*, or dowry,
belongs to the wife and not to the husband ; also to the rule
that the increase of a slave are not fruits, as it is applied in
the case of tutor or curator, to whom by L. 2, Tit. 7, Lib. 3,
Fuero Real, the tenth of the fruits of the minor's property is
allowed for administration ; yet he cannot take the tenth of
the increase of slaves, because these are not classed as fruits ;
and so it is distinctly resolved by Baeza, Joan Guitenez and
Escobar.   I shall recur to this work in a subsequent portion
of this Opinion.

But, although the general rule of Spanish and Roman Law,
as we have seen, is, that the young of female slaves are not to
be classed as fruits and belonging as such to the usufructuary,
yet it is claimed that the rule is not applicable to the commu-
nity of gains ; that all the profits or fruits of the separate prop-
erty of each partner belong to the community, and that the
increase of slaves forms no exception, so as to allow them to
be taken from the general mass of the profits.

Let us examine the provisions which, in Spanish law, constitute community property, to ascertain whether the rule as to the fruits which shall go to the community, be of a character so sweeping that it must necessarily give the increase of slaves, as fruits, to the community, though in direct repugnance to the general rule and policy of the law, that such increase are not to be regarded as fruits.

Ganancial property is that which husband and wife, living together, acquire during matrimony, by a common title, lucrative or onerous; or those which husband and wife or either acquire by purchase, or by their labor and industry, as also the fruits (*frutos*) of the separate property which each brings to the matrimony or acquires by lucrative title during the continuance of the partnership. (Escriche, BIENES GANANCIALS.) Although the husband may have more than the wife, or the wife more than the husband, whether in real or moveable property, the fruits shall be common to both. (L. 1 & 3, Tit. 4, Lib. 10, Nov. Recop.) Whatever the wife and husband may gain is common to both. (L. 1, Tit. 3, Lib. 3, Fuero Real.)

It appears very clearly from the citations, that the fruits of the separate property of the partners fall into the community, but this is not conclusive that the increase of the separate slaves of the partners shall be held as fruits and go into the community. The general rule, recognized from the earliest times is, that such increase are not to be treated as fruits; and therefore they do not belong to the usufructary, though he be entitled to the fruits of the usufruct; nor do the inrease of a dotal slave, not appraised, go to the husband, though entitled generally to the fruits and profits of the dowry; nor, as appears from Lagunez, would they belong to the fiduciary heir having a life estate with all its profits, but would, though they were born during the life estate, go the fideicommissary heir, or remainder man; nor are they subject to the claims of the tutor of a minor, though he be allowed

the tenth of the produce, or fruits of the estate, for administration.

To allow the provision requiring the fruits of the separate property of each partner to go into the community, to embrace the increase of slaves, would be at war with the general rule which exempts such increase from the class of fruits, and with the rule as applied in the relations to which we have just referred, in some of which there is a very striking analogy between the relation which the usufructuary possessor bears to the real owner, and that which the community bears to the husband and wife. The usufructuary possessor of a slave and the husband in respect to the unappraised dowry, are in conditions analogous to that of the community. Each of the three is entitled to the fruits of property which belongs to another, and the rule which, in the two first cases, exempts the increase of slaves from these fruits, should, on principles of sound construction, be applied by analogy to the third ; and if so, then the increase of separate slaves would not go, with the other fruits or profits, to the community, but be reserved for the owner.

There are other considerations, of some weight, in extending the rule by analogy so as not to include the increase of slaves in the same category with the young of animals. Although slaves are property, yet in many respects they are persons, and are treated as such. The children for years require the care and attention of the mother, and though there is no law preventing the separation of the mother from the child in infancy, yet such separation, unless induced by necessity, is repugnant to the feelings of humanity, and is against the moral sense of the community. To give the mother, then, to the husband, in this and the like cases, and their children to the partnership, would be in conflict with the general rule, and with the rule in various analogous cases, which exempts the children from the operation of laws in relation to fruits, and

contrary to the humane feelings with which this dependent class should be regarded.

We believe that the laws constituting ganancial property, and bringing fruits of the private property of each partner into the mass of gains, should not be so construed as to virtually repeal the general principle applicable to usufructuary estates, viz. : that the increase of slaves should not be ranked among the fruits, and as such given to the usufructuary, but be reserved for the master or owner, and that consequently the increase of the separate slaves of the partners belong to the owners of the mothers and form no part of the community.

I am aware that many of the commentators on Spanish Law hold a different opinion. Gegorio Lopez, in his Commentary on L. 20, Tit. 11, Partida 4th, and also on other laws, maintains, or rather intimates, that the rule exempting the increase of slaves from fruits, does not apply to the community between husband and wife, in which all the gains must become common. Lagunez says, in substance, that this point is much contested, and he enumerates several works of authority, in which it is held that the exception as to the increase of slaves applies, and that they should be reserved from the community, for the separate owner of the mother. The author thinks the law ought to be construed otherwise, and believes this to be the more common opinion, and cites various writers and authors by whom this construction is maintained, and who hold that the increase of slaves should be divided with the other gains, between man and wife.

In this conflict, we feel at liberty to maintain the opinion which is conceived to be most in harmony with the rules and the general spirit and policy of Spanish jurisprudence, in relation to the subject matter, and the one which is the best adapted to our own situation and views of sound policy.

On questions arising under Spanish Law, we are accustomed to refer, with much interest, to the decisions of the learned tribunals of Louisiana, where such subjects are discussed and

thoroughly elaborated by both the bar and the bench ; but unfortunately, their decisions on this question are conflicting, and consequently not entirely satisfactory.

The first case in which the question arose is believed to have been in Frederick v. Frederick, 10 Martin, 189. The marriage was in 1805, when the Spanish Law was in force. A negro woman, brought by the wife, had subsequently, and during the marriage, a child ; and it was held by the Supreme Court, reversing the decision of the Court below, that the child, having issued from a paraphernal slave, was itself paraphernal.

This decision is held in 11 Robinson, 526, to have been with reference to the Code of 1808. But in Brodich v. Johnson, published in a note to Childers v. Johnson, 6 Annual, 639–40, the case is cited as a decision on Spanish Law. The question certainly arose under that law, though the citations in the Opinion were from the Code of 1808.

The point arose again in Ducrest's Heirs v. Bijeau's Estate, 8 N. S. 198, in which the Court said the increase of slaves and animals, by the early laws of Spain, belonged to the spouse who brought them into the marriage. By the later Statute and the modern jurisprudence of that country, the produce of these things are considered to result as much from the care and solicitude of the possessors, as from nature, and that as such they form a part of the gains which are to be divided between husband and wife ; and reference in support of the opinion is had to some passages in the earlier editions of Febrero.

In the first passage, Febrero says, that by the most ancient law, the husband did not have exclusively as his own, neither the young of the dotal servants of the wife, nor those of the flocks or productive animals, unless they were received at the risk of their deterioration or loss ; nor were they divided with him, but belonged to the wife, whether born during matrimony or after divorce ; but according to the laws now in force, the children of the slaves of either of the conjugal partners

are common to both, because they are comprehended under the general term of " reditos," or profits, and these proceed as well from the property of one of the two, as from that of both, and become common indiscriminately in the same manner as fruits to which they may be compared, since they are like the fruits of industry and not of nature, because their production is more the result of industry, care and solicitude, than of nature, &c.

Upon this passage it may be remarked, first, that there never was a law in Spain by which the young of dotal flocks did not go to the husband unless he received the flocks or animals at the risk of their deterioration or loss. He was always entitled to the young of dotal animals, whether they were appraised or unappraised, and whether received with or without risk. But not so as to the increase of female slaves, who were not received with appraisement, nor at the risk of deterioration or loss. In such case the issue went to the wife, and not to the husband, in diametric opposition to the rule and practice by which, in such cases, the young of animals went to the husband, and not the wife.

In relation to the word " reditos," as being a more generic term than *frutos*, and as consequently including the issue of slaves, although they may not be embraced by the term *frutos*, I would remark that the term " reditos " is not used in the laws of Spain which constitute community of goods between husband and wife ; but the term which is used is " frutos." The synopsis of the Law 3, Tit. 3, Lib. 3, of the Fuero Real, is in these words " *Los frutos de los bienes propios del marido o de la muger sean communes ;*" and the substance of the law, as we have cited it above, is, that although the husband may have more than the wife, or she more than the husband, yet the fruits (frutos) of the property of both shall be common to both ; so that, if there be any difference, substantially, between the terms fruits and profits, it operates in favor of the rule giving the increase, as not being among the fruits, to the owner of the mother. But there is believed to be no differ-

ence, in substance, between the two terms. Lagunez in Nos. 20 and 21 of Cap. 8, speaks of such distinction as sanctioned by Paulus, Rodrigues, Baeza; that the increase of slaves might be comprehended under the term "redditus" as being more comprehensive than the term fruits; but in No. 22d, he shows that this opinion and inference were directly opposed by the response of Papinian. The argument that the young of animals and slaves were to be considered as industrial, and not natural fruits, is of but little force. It is a general rule that the usufructuary must take proper care of the property in usufruct. This is one of his obligations, and though he may not be entitled to the increase of slaves, held by him in usufruct, yet he is bound to give them the care and attention demanded · by their age and condition.

But there seems no good ground for calling the young of animals or slaves industrial fruits. Escriche, throughout his Dictionary, where there is a reference to the subject of fruits, classes the young of animals as natural and not industrial fruits, though he says that as there is necessity to nourish, lodge and cure animals in their infirmities, many jurisconsults pretend that the young of animals as well as the milk, wool or skin, are industrial fruits. Febrero cites various authors in support of his opinion. These, or the most of them, are cited by Lagunez, who shows that there are other jurisconsults who maintain an opposite doctrine.

In 11 Rob. 525, the view of the Spanish Law, as taken by the Court in the foregoing case from the 8th New Series, was approved, and it was held that the issue of a paraphernal slave went, under the Spanish Law, to the community of acquets; but it was also substantially held, that the Code of 1808 introduced some modifications of the Spanish Law on the subject, and that under the Code, where the mother is paraphernal, the issue is also paraphernal, or the separate property of the wife.

We come now to the elaborate and very full opinion in the

case of Childers v. Johnson, delivered in April, 1850, and pub-
lished out of its place in Sixth Annual, 634, among the deci-
sions of 1851.   The question, in that case, arose under the
Code of 1825.   We may here observe that there is no article
or provision in either the Code of 1808 or of 1825, by which
the increase of slaves, the separate property of a conjugal
partner, are expressly exempted from the general rule by
which the community acquires the profits of the separate prop-
erty of either husband or wife made during the marriage.

In the case last cited, the Court refers, in detail, to various
provisions of the Code, by which the young of slaves are de-
clared to belong to the owner of the mother ; that the children
of slaves, subject to usufruct, who are born during its duration,
belong to the owner ; that in case of dotal slaves, the husband
is bound to restore the living children who may have been
born from such slaves.   Reference is also made to the rule of
Roman Law, exempting the issue of slaves from the class of
fruits, and the Spanish Law as to the increase of a slave, held
by a usufructuary right ; and the Court comes to the conclu-
sion that the rights of the community and of the usufructuary
are analogous, and that the rule which, in the latter case, gives
the increase to the owner, should be applied to the former, and
that the increase should belong to the owner of the mother, and
not fall into the mass of acquets and gains.   The Court holds
it to be a sound rule of interpretation, in construing an article
of the Code with reference to the subject matter, to take into
view the general system of legislation upon the subject matter
contained in the same work, and where a provision is invoked
in derogation of the common rule regulating the subject mat
ter, the intention to so derogate should be clear and beyond
reasonable doubt.   This is believed to be a sound rule of con-
struction, and applies with as much force to the subject mat-
ter of the increase of slaves, under the Spanish law, as under
the Louisiana Code.   The Court also reviews the case of Du-
crest's heirs v. Bijeau's estate, 8 N. S. 198, and questions the

soundness of its conclusions ; and, in fact, shows by reference to Spanish authorities, that they are not sound.

We have stated before, that the codes of Louisiana do not expressly provide that the increase of slaves, born during marriage, should belong to the owner. But, under both codes, this has been held the true rule by analogies drawn from other provisions of the codes, by which, in special estates, the increase of slaves were excepted from the fruits or profits of the usufruct ; and it would seem that if the same rule drawn from analogy be applied under the Spanish law, the same conclusion must be attained.

There is another case reported in the same volume, viz : the 6 Annual, p. 689, in which it is loosely laid down, that children of the paraphernal slaves of the wife, born during the marriage, became, under the Spanish law, the property of the community of acquets and gains. This case was decided in September, 1850, and to this extent is inconsistent with the previous case in April of the same year. But it must be remembered that the first Opinion was not published until 1852. The first was delivered in New Orleans, the latter in Opelousas, when the Judge who delivered the former was not present, and that portion of his Opinion which had reference to the Spanish law may not have been remembered. Besides, the main object of the Opinion, in the last case, was, not to decide authoritatively on the Spanish Law, but to lay down a very important rule, viz. : that the children of a paraphernal slave, born after the adoption of the Code of 1808, belonged to the wife, though the marriage was had before the adoption of that Code ; and, in fact, that the rights of property in the community change with the successive changes of the law, even as to marriages celebrated before the change. This principle might perhaps admit of question, but with that we are not concerned in this case. It had the effect to relieve the Court from the necessity of a severe scrutiny into the rules of the Spanish Law in relation to the subject matter, as the same

Vol. XVIII.          41

result was attained by applying a law passed after the marriage, to the child of a paraphernal slave, which was born subsequent to the law.

It is believed that as a general rule in this State, the children of slaves, in the divisions of estates, have been regarded as belonging to the owner, and not the community, whether the marriage were before or since the Act of 1840, by which it was expressly declared, in substance. that the children of slaves should go to the owner of the mother. This enunciation of positive law must be taken as a declaration of what constitutes sound policy on this subject. And if it even were conclusively established. that a different rule prevailed, by construction, under the laws of Spain, it is questionable whether it should be allowed here, opposed, as it would be, to the true rule as recognized by the law of 1840 and the existing laws, especially when it is considered that Mexico attempted an abolition of slavery, and though it continued to exist in Texas, yet the rules of Spanish Law, though entitled to much weight, and as forming ordinarily the rule for decision on rights connected with the relation of slavery, yet have not such absolute conclusive force on this subject, as to exact obedience in particulars which may be unreasonable, or in direct contradiction of established usage and rules of sound policy. I have barely alluded to this last point, without intending to express any definite conclusion, or to assume this as the ground for the decision.

There appears to be no objection to the division of the other effects and property. The amount brought by either party into the marriage was trifling, and nearly equal in value, and not of sufficient consequence to make it necessary to deduct the original capital from the mass of the effects prior to the partition.

Without scrutinizing or discussing, in detail, the repulsive features in the facts of the case, it will be sufficient to say, that upon the whole, the conduct of the husband was of such a

character, there was so much cruelty in the deliberate, but groundless charge of infidelity against his wife, in his desertion of her bed and of the house, and obstinately persisting continuously to live in a negro house with his negro woman, though there may have been no improper intimacy between them, as however, there was, in the opinion of the jury in this case, his perverse neglect to furnish his wife with the necessary supplies,—these facts aggravated by other minor circumstances, involve that degree and character of cruelty, which, in contemplation of the Statute, are sufficient to authorize a divorce from the bonds of matrimony ; and so far the decree of the District Court is affirmed.

The question in relation to the prior marriage of the plaintiff to James Bird, in Alabama, becomes important only, or mainly, as it my affect her right to an equal share of the gains made during the marriage. It is not essential that the several points raised, as to the admission of evidence, to establish this marriage, its dissolution by decree of divorce, and the effect which the other facts in connection with this marriage, should have on the rights of these parties respectively, as the cause will be remanded, and the parties may not, perhaps, offer the evidence to which there was objection, and the cause, on the second trial, may present new features, and a different state of facts from those presented at the last trial.

The subject is interesting, and invites discussion ; but as the Opinion has been protracted to much length, we decline the examination of points not absolutely essential to the decision. I will only say, to prevent misapprehension, that we are not to be understood as intimating, that, in any state of facts which might probably be established, the plaintiff could be deprived of an equal, or, at least, a large share of the gains made during the marriage.

We are of opinion that the children of the slaves Jane and Mary, are the separate property of the defendant, they being the issue of slaves who are his separate property, and that

they constitute no part of the community of gains ; and we are of opinion that the plaintiff was entitled to a divorce ; and it is therefore ordered, adjudged and decreed, that the judgment, so far as it decreed a divorce from the bonds of matrimony, be and the same is hereby affirmed, and that in all other respects, the judgment be and the same is hereby reversed, and that the cause be remanded for a new trial.

Ordered accordingly