**Arlene O. MARSHALL, Appellant,**

v.

**J.W. "Woody" MARSHALL, Appellee.**

**No. 05–86–00366–CV.**

Court of Appeals of Texas, Dallas.

July 22, 1987.

Rehearing Denied Aug. 24, 1987.

Thomas R. Hartnett, Dallas, for appellant.

James S. Robertson, Jr., Anne T. Moody, Robertson & Miller, Dallas, for appellee.

Before WHITHAM, STEWART and McCRAW, JJ.

STEWART, Justice.

Arlene O. Marshall and J.W. "Woody" Marshall sued each other for divorce. In four points of error, Arlene contends that the trial court (1) abused its discretion in denying her claims for reimbursement for community funds used to pay Woody's separate debt and for gifts of community funds to Woody's daughter and grandson; (2) erred in ruling that the community estate is not liable for all unpaid debts of Leasing Telephone Concepts, Incorporated (LTC), including those incurred after June 25, 1984; (3) abused its discretion in divid-

ing the household furnishings in kind; and (4) erred in awarding her only $5,500 for the value of the Mercedes automobile wrongfully taken from her possession by Woody.

In two cross-points, Woody asserts that the trial court erred in finding that he gave Arlene a usufructuary right in the Mercedes automobile which he wrongfully terminated and in ordering him to pay $12,500 of Arlene's attorney fees. In one cross-point, Marshall Pipe and Supply Company (the partnership) maintains that the trial court erred in denying its claim to ownership of the household furnishings used by the spouses during marriage. We affirm in part, reverse and render in part, and reverse and remand in part.

Approximately five months after being divorced from their first marriage, the parties remarried on March 18, 1983. On June 25, 1984, Woody filed for a divorce from their second marriage, and later the same day Arlene also filed for divorce. The suits were consolidated with Woody designated as petitioner and Arlene as cross-petitioner. The trial court entered the decree of divorce on December 31, 1985. The marriage involved no children. By agreement, on appeal, Arlene is designated as appellant and Woody as appellee. Neither party appeals the divorce itself. We develop the facts as they relate to the points.

## I.

### ARLENE'S REIMBURSEMENT CLAIMS

In her first point of error, Arlene argues that the trial court incorrectly characterized the disbursements by the partnership to Woody as his separate property and that, as a result, the trial court abused its discretion in denying her claim that Woody should be ordered to reimburse the community for (1) $125,375.50 of community funds used to pay Woody's 1982 taxes, a separate debt incurred before the marriage, and (2) $63,325.58 of community funds that Woody gave to his daughter during the marriage.

### EXTENT OF COMMUNITY EARNINGS

To resolve Arlene's contentions, we must first determine the extent of the communi-

ty earnings during the marriage. The partnership disbursed $542,315.72 to Woody during the marriage. The partnership records and Woody's tax returns reflect that some amounts were distributed as "salary" and other amounts were distributed as "distributions of profits." Woody argues that only $22,400 of the amount disbursed was salary and that the rest was a return of capital and, therefore, his separate property. Arlene argues that all the disbursements were either salary or distributions of profits and, therefore, community.

Arlene first argues that all partnership disbursements to Woody during marriage were community property because they were acquired during the marriage, TEX. FAM.CODE ANN. § 5.01(b) (Vernon 1975), and, therefore, are presumed to have been community property. *Id.* § 5.02. She further contends that whatever is earned from the labor and effort of either spouse is community property, *Givens v. Girard Life Insurance Co.*, 480 S.W.2d 421, 423 (Tex. Civ.App.—Dallas 1972, writ ref'd n.r.e.); thus, all the disbursements are community property because they are compensation for Woody's labor and effort on behalf of the partnership. Finally, she maintains that the partnership distributions are revenues and profits from Woody's separate property, thereby making them community property, *Arnold v. Leonard*, 114 Tex. 535, 273 S.W. 799 (1925); consequently, whether classified as "distributions of profits" or "salary," all disbursements are community.

Woody brings three responses to justify the separate property characterization of the trial court. First, he argues that he and Arlene entered into a prior separate property agreement providing that all income arising from separate property owned or acquired by either spouse would be the separate property of said spouse. Second, he argues that the distributions from the partnership were distributions of capital and were, therefore, his separate property. Third, he contends that all community property distributions to him and to Arlene

during the marriage had been consumed by them.

## SEPARATE PROPERTY AGREEMENT

We first consider whether the separate property agreement (the agreement) has any bearing on the present case. The parties were first married on April 26, 1982. On June 14, 1982, they executed a separate property agreement, which provides: "All income and/or property arising from the separate property now owned by [said spouse] or hereafter acquired by [said spouse], shall be the sole and separate property of [said spouse]." The October 15, 1982, judgment of divorce recited that the agreement was valid.

Approximately five months later the parties remarried, and it is from this marriage that the parties seek a divorce and a property division. Arlene's brief ignores the existence of the agreement; Woody's argues that the agreement is still in effect.

Woody relies primarily upon *Sorrels v. Sorrels*, 592 S.W.2d 692 (Tex.Civ.App.—Amarillo 1979, writ ref'd n.r.e.). In *Sorrels*, the property settlement incident to the parties' first divorce required Mr. Sorrels to pay alimony to Mrs. Sorrels after the divorce. It further provided that "should [Mrs. Sorrels] remarry, such remarriage shall have no effect upon obligations of [Mr. Sorrels] to make the aforesaid payments." Mr. and Mrs. Sorrels subsequently remarried and divorced for a second time, and Mr. Sorrels argued that the second marriage invalidated the payment obligations. The court disagreed. The agreement had whatever legal force the law of contracts would give it. *Id.* at 696.

*Sorrels* is distinguishable. In *Sorrels*, the agreement specifically stipulated that a subsequent remarriage would have no bearing on the alimony payments. In the present case, no express provision provides for the termination or continuation of the agreement.

■ When the duration of the contract is not expressly dictated by the agreement, courts will frequently presume that the parties intended that the agreement should continue for a reasonable time. *Beckner v. Barrett*, 81 S.W.2d 719 (Tex.Civ.App.—Dallas 1935, writ dism'd w.o.j.). When it appears, from the intrinsic nature of the agreement, that an agreement is necessarily limited as to duration by the happening of any one of several contingencies, this ascertainable contingency determines the duration. *See Brittian v. General Telephone Co.*, 533 S.W.2d 886 (Tex.Civ.App.—Fort Worth 1976, writ dis'd w.o.j.); *Kennedy v. McMullen*, 39 S.W.2d 168 (Tex.Civ.App.—Beaumont 1931, writ ref'd).

■ The agreement in this case was executed less than two months after the first marriage. The agreement recites:

WHEREAS, JOSEPH WOODROW MARSHALL and ARLENE O'BRIEN MARSHALL were married on April 26, 1982, *and are now husband and wife;*

WHEREAS, at the time of said marriage each owned separate property and each expects that each might *hereafter* acquire separate property; and

WHEREAS, both desire the income and/or property arising from all of the respective separate property now owned or which *hereinafter* might be acquired by each shall be the respective separate property of each, it is therefore agreed between them as follows:....

(Emphasis added.) We conclude from these provisions that the parties were contracting in relation to the existing marriage only. It is unreasonable to assume that they anticipated a series of remarriages and divorces. The first divorce is the ascertainable contingency that determined the duration of the agreement; consequently, the agreement has no bearing on either the second marriage or the second divorce. The agreement does not justify the trial court's separate characterization of the partnership distributions.

## DISTRIBUTIONS FROM CAPITAL

Woody's second response is that the distributions from the partnership, other than the salary in the partnership agreement, were from his capital account and were, therefore, his separate property. We de-

velop Woody's argument and the reasons why we disagree with it below.

The partnership engaged in the business of exploring for, developing, and producing oil and gas. The partnership acquired all its oil and gas leases before the second marriage. The partnership agreement provides that it will pay Woody $700 in salary per month. For the duration of the marriage, the amount comes to $22,400. The partnership agreement also provides that all other distributions are from the distributee's share of the profits. The partnership disbursed $542,315.72 to Woody during the marriage. Woody maintains that only $22,400 was community property and that the rest was a return of capital.

The Texas Uniform Partnership Act (UPA) provides that unless the partners agree otherwise, no partner is entitled to remuneration for acting in the partnership business and that each partner is to share equally in the profits. TEX.REV.CIV. STAT.ANN. art. 6132b, § 18(1)(a) & (f) (Vernon 1970). Because the agreement is controlling, Woody concedes that the $22,400 is community.

Woody next points to *Norris v. Vaughan*, 152 Tex. 491, 260 S.W.2d 676 (1953). In *Norris*, the husband owned a separate determinable fee interest in the Pakan wells and an interest in a separate partnership that was in the sole business of acquiring gas wells, drilling under lease agreements, and selling the gas. The Texas Supreme Court held that the proceeds from the production and sale of oil and gas from the Pakan wells and from the three leases acquired by the partnership before the husband's marriage were the husband's separate property.

The supreme court applied the aggregate theory of partnership and treated the individual partners as owners of the partnership property. Thus, the court characterized partnership property as separate or community, depending upon whether the partnership acquired its property rights before or after the marriage of the partner/husband. Because the husband had acquired his interest in the partnership before the marriage, that interest was his

separate property. Likewise, because the partnership had owned its interest in three producing gas wells prior to the husband's marriage, the court held that the husband's interest in the three wells was his separate property and the gas produced from them was "an invasion of the assets comprising [husband's] separate estate." *Id.* 260 S.W.2d at 681. The court further held that the proceeds from the sale of oil and gas produced from separate property remains separate so long as the oil and gas can be definitely traced and identified. The court reasoned that, since oil and gas in place are part of the corpus of the land, when they are produced, they simply undergo a mutation. Similarly, when the oil and gas production is sold, the proceeds are derived from the piecemeal sale of a separate asset, the corpus of land, and remain separate property. *Id.* at 679–80.

Woody contends that the *Norris v. Vaughan* analysis is applicable in this case because it is undisputed that his partnership interest is his separate property, that the primary business of the partnership is production of oil and gas, that all the partnership leases were acquired prior to marriage, and that the proceeds from the sale of oil and gas are simply mutations of the oil and gas in place, and, therefore, all partnership proceeds from these sales distributed during the marriage remain his separate property.

Arlene has two responses. First, she argues that the adoption of the Uniform Partnership Act in 1961 has amended *Norris*. Second, she contends that because Woody's tax returns and the partnership's own records reflect that Woody received $334,891 in salary for the years 1983 and 1984, Woody cannot now gainsay them. Arlene emphasizes that whether the distributions are for salary or from partnership profits makes no difference, since both salary and profits from separate property become community property. *Trawick v. Trawick*, 671 S.W.2d 105, 109 (Tex.App.— El Paso 1984, no writ).

With the passage of the Uniform Partnership Act in 1961, Texas discarded the aggregate theory and adopted the entity

theory of partnership. Under the UPA, partnership property is owned by the partnership itself and not by the individual partners. In the absence of fraud, such property is neither community nor separate property of the individual partners. A partner's partnership interest, the right to receive his share of the profits and surpluses from the business, is the only property right a partner has that is subject to a community or separate property characterization. TEX.REV.CIV.STAT.ANN. at 6132b §§ 8, 26, & 28–A; Note, *Community Rights and the Business Partnership*, 57 TEXAS L.REV. 1018, (1979); Bromberg, *Commentary on the Texas Uniform Partnership Act*, 17 TEX.REV.CIV.STAT. ANN. 300–01 & 321 (Vernon 1970). Further, if the partner receives his share of profits during marriage, those profits are community property, regardless of whether the partner's interest in the partnership is separate or community in nature. TEX. FAM.CODE ANN. § 5.01(b) (Vernon 1975); *Arnold v. Leonard*, 273 S.W. at 799; Note, 57 TEXAS L.REV. at 1032.

The supreme court recognized the changes in partnership law wrought by the adoption of the UPA in *McKnight v. McKnight*, 543 S.W.2d 863 (Tex.1976). There the court determined that the only partnership-related property a trial court can award upon dissolution of a partner's marriage is the partnership interest. *Id.* at 867–68; *see Haney v. Fealey, Bate, Deaton & Porter*, 618 S.W.2d 541, 542 (Tex.1981).

Initially, we note that according to the partnership records, Woody's distributions were a series of draws allocated to him, Arlene, and Debra (Woody's daughter), many of which were based on payments by the partnership to personal creditors on behalf of one of these three. The major "distribution" each year was the partnership's payment of Woody's individual income tax liability. It is true that a portion of the distributions was closed to Woody's capital account at the end of the year, but this was simply a bookkeeping entry after the fact.

The amount closed to the capital accounts of both partners, Woody and his ex-wife, Ruby, was based on the total of their draws for the year. In this manner the accountant determined their personal income and their income tax thereon; the accountant then had the partnership pay their personal income tax. These amounts are reflected on the partnership returns as "withdrawals and distributions" in the reconciliation of the partners' capital accounts. Woody's draws throughout each year at issue, and historically, always exceeded Ruby's. Consequently, Woody's excess draws were allocated to salary for Woody on the partnership books and reported as "guaranteed payments for partners" on the partnership tax returns. Woody reported all disbursements received from the partnership, either directly or indirectly, as ordinary income on the spouses' joint tax returns for 1983 and 1984.

Woody apparently relies on the rule that mutations of separate property remain separate if properly traced. *Norris*, 260 S.W.2d at 679. However, a withdrawal from a partnership capital account is not a return of capital in the sense that it may be characterized as a mutation of a partner's separate property contribution to the partnership and thereby remain separate. Such characterization is contrary to the UPA and implies that the partner retains an ownership interest in his capital contribution. He does not; the partnership entity becomes the owner, and the partner's contribution becomes partnership property which cannot be characterized as either separate or community property of the individual partners. TEX.REV.CIV.STAT. ANN. art. 6132b, §§ 8, 25, & 28–A(1) (Vernon 1970); Bromberg, 17 TEX.REV.CIV. STAT.ANN. at 300–01. Thus, there can be no mutation of a partner's separate contribution; that rule is inapplicable in determining the characterization of a partnership distribution from a partner's capital account.

Further, the *Norris v. Vaughan* characterization of proceeds from the production of oil and gas is inapplicable to a partnership receipt of such proceeds, for they are simply partnership property and are not subject to characterization as sepa-

rate or community property. TEX.REV. CIV.STAT.ANN. art. 6132b, §§ 8, 25, & 28–A(1) (Vernon 1970); *McKnight v. McKnight*, 543 S.W.2d at 867; Bromberg, 17 TEX.REV.CIV.STAT.ANN. at 300–01. In this case, all monies disbursed by the partnership were made from current income. The partnership agreement provides that "any and all distributions ... of any kind or character over and above the salary here provided ... shall be charged against any such distributee's share of the profits of the business." Under these facts, we hold that all of the partnership distributions that Woody received were either salary under the partnership agreement or distributions of profits of the partnership.

 Although the partnership utilized the bookkeeping device of allocating to salary Woody's withdrawals that were in excess of Ruby's, that device does not make such distributions "salary" contrary to the partnership agreement. The withdrawals nevertheless were distributions of partnership income or profits and, thus, community. We hold that all distributions by the partnership to Woody during the course of the second marriage were community property. Woody's second argument in support of the trial court's separate characterization of the partnership distributions is overruled.

## CONSUMPTION OF COMMUNITY DISTRIBUTIONS DURING THE MARRIAGE

Finally, Woody argues that regardless of whether his partnership distributions during marriage were separate or community, the spouses consumed all income during the marriage. Therefore, argues Woody, any mischaracterization of these distributions was harmless error. Woody relies upon (1) the trial court's finding that "all income received by the community in exchange for community labor was consumed during the marriage," (2) Arlene's reliance on his testimony that he and she "might have some community property in a house on Bonnard Street. That would be all I know of," and (3) Woody's own analysis of the distributions, which results in a maximum total community income of $328,067.

 We disagree with Woody; the evidence does not show that the spouses consumed all income during the marriage. First, the finding of the trial court addresses only the portion of the income attributable to community labor and fails to address other income received by the community. Second, Woody's testimony has no probative value on the issue because it is based on his lay conclusion concerning the characterization of the property at issue, which is a question of law reserved for the court to decide. Third, we held earlier that the partnership disbursed $542,315.72 to Woody, all of which was community income. Woody's analysis addresses only $328,067 of that amount, which still leaves $214,248.72 of community income unaccounted for. Consequently, we hold that the evidence does not show that the spouses consumed all income during the marriage and that the trial court's mischaracterization of the partnership distributions is not harmless error. Woody's argument that the spouses consumed all community income during the marriage is overruled.

## WOODY'S 1982 TAX DEBTS

 Having determined that all partnership distributions to Woody during the marriage were community property, we turn to Arlene's contention that the community should be reimbursed for the $125,375.50 that the partnership paid during the marriage for the balance due on Woody's 1982 taxes. It is undisputed that Woody's 1982 tax liability was his separate debt. This payment was charged to Woody's account by the partnership and became part of the total funds distributed to Woody during the marriage. Woody and Arlene reported this figure as part of their income on their joint 1983 tax return, and the community paid taxes on it. The trial court found that the source of the funds used by the partnership to pay Woody's 1982 taxes was the "proceeds of production which were earned prior to marriage." It further found, "[T]he payment [of the taxes] by the partnership gives rise to no

claim to Arlene Marshall upon which relief can be granted." It is evident from these findings that the trial court denied Arlene's claim for reimbursement regarding these funds because the trial court concluded that the funds could be characterized as separate or community depending upon when the partnership earned them. This finding is based on the *Norris v. Vaughan* rationale. The partnership funds used to pay Woody's 1982 taxes were neither separate nor community until the partnership disbursed the money for the taxes. At that point, the money became revenue acquired during marriage from Woody's separate partnership interest; consequently, the funds were community property. TEX. FAM.CODE ANN. §§ 5.01(b) & 5.02 (Vernon 1975); *Arnold v. Leonard*, 273 S.W. at 802. Accordingly, we remand Arlene's claim for reimbursement for one half of the money paid for Woody's 1982 taxes to the trial court for its redetermination in light of our holding that these funds were community property.

## GIFTS TO WOODY'S DAUGHTER

Arlene also maintains that the community is entitled to reimbursement for funds that Woody gave to his daughter, Debra, and her son, Dustin, during the marriage. She asserts that the evidence reveals that Woody, or the partnership on his behalf, gave Debra and Dustin community funds totaling $103,235.44 during the marriage; that the community received benefits from exemptions and deductions on the parties' joint tax returns for 1983 and 1984 of $38,-909.86; and that the balance of $63,325.58 was composed of gifts which were unfair and which constituted constructive fraud on the community.

Although the trial court made no specific finding regarding whether the gifts were made from separate or community funds, it found in relation to the gifts:

A. No dishonesty of purpose or intent to deceive Arlene Marshall;

B. That the transfers were not made with the primary purpose of depriving Arlene Marshall from having the use and enjoyment of the assets comprising the transfer;

\* \* \* \* \* \*

D. No breach of a fiduciary relationship which resulted in injury. Based upon the above findings of fact, the court also finds no fraud either actual or constructive.

From these findings, we conclude that the trial court assumed that the gifts were made from community funds in ruling on Arlene's claim for reimbursement based on these gifts. Therefore, we need not remand this claim, as we have the claim for reimbursement for the 1982 tax payment, because of a mischaracterization of funds used.

Arlene argues that the trial court erred in placing the burden on her to prove constructive fraud[1] because the law presumes constructive fraud when a spouse makes gifts to a stranger to the marriage. She further relies on the trial court's statement, "[T]here's already evidence in this trial that Mrs. Marshall did not actively consent to the giving of those gifts to the daughter." Finally, she maintains that there is insufficient evidence to support a finding that the gifts were fair.

▬ We agree that when there is constructive fraud, the burden is on the donor to prove that the gifts of his or her share of the community property are fair; otherwise the gift will be set aside. *Horlock v. Horlock*, 533 S.W.2d 52, 55 (Tex.Civ. App.—Houston [14th Dist.] 1975, writ ref'd n.r.e.). The courts consider three primary factors in determining whether the wife's claim of constructive fraud exists: the size of the gift in relation to the total size of the community estate, the adequacy of the estate remaining to support the wife in spite of the gift, and the relationship of the donor to the donee. *Id.*

▬ We conclude that the evidence supports the trial court's finding of no constructive fraud. The community received $542,315.72 during the marriage as Woody's special community property. The

---

**1.** Arlene does not complain of the trial court's finding of no actual fraud.

contested gifts of $63,375.58 are only 11.7 percent of this amount. The remaining $478,940.14 in community funds from the partnership was sufficient to support the wife. Finally, Woody made the gifts to his daughter and grandson, the natural objects of his bounty. We also agree with the trial court's finding that there was no intent to deceive Arlene. She knew about the gifts, and although she may not have actively consented to them, there is also no evidence that she objected to them. We overrule Arlene's complaint of the trial court's denial of her claim for reimbursement for gifts to Debra and Dustin.

## II.

### LTC DEBTS

In point of error two, Arlene contends that the trial court incorrectly ruled that the community estate is not liable for all unpaid debts of the business Leasing Telephone Concepts, Incorporated (LTC), including those incurred after June 25, 1984. Arlene began LTC in May of 1984. The trial court signed an agreed temporary order on August 17, 1984, that provided, "Each party shall be responsible for the debts incurred by him or her on or after June 25, 1984." Arlene terminated LTC in December 1984, at which time LTC was indebted in the amount of $60,000. The trial court ruled that the $60,000 debt of LTC was Arlene's responsibility by virtue of the August 17, 1984, temporary order.

In its finding, the trial court found that the August 17 order provided, "[E]ach party will be *solely liable* for any debt incurred by them subsequent to June 25, 1984." (Emphasis added.) This finding is a misstatement of the terms of the order. The trial court also found that this provision "controlled" these subsequent debts. In the judgment, the court characterized the debts incurred by Arlene after June 25, 1984, including those debts associated with LTC, as her separate debts and obligations. Arlene contends that this mischaracterization of the LTC debt as her separate debt resulted in the trial court's abusing its discretion in dividing the community debts

and that this part of this case should be reversed and remanded.

■■■■ We agree with Arlene that a provision in an agreed temporary order indicating which debts a spouse will be responsible for during the pendency of the case neither binds the trial court in its division of property and debts after a trial on the merits nor transforms community debts into the separate debts of the spouse incurring them. It is undisputed that the LTC debt was incurred during marriage and that, but for the agreed temporary order, it should be characterized as a community debt. Because we conclude the temporary order is not controlling, we hold that the LTC debt is a community debt. We sustain Arlene's second point of error.

## III.

### HOUSEHOLD FURNISHINGS

■■ In point of error three, Arlene contends that the trial court abused its discretion by dividing in kind the household furnishings located at the house on Bonnard Drive. Arlene argues that no evidence supports a division in kind, and, in any event, the division of the furnishings was neither just nor right, as required by section 3.63 of the Texas Family Code. The trial court's division of marital property will not be disturbed on appeal absent a showing of an abuse of discretion. *Murff v. Murff*, 615 S.W.2d 696, 698 (Tex.1981). This court must indulge every reasonable presumption in favor of a proper exercise of discretion by the trial court in dividing property. *Van Dyke v. Van Dyke*, 624 S.W.2d 800 (Tex.Civ.App.—Houston [14th Dist.] 1981, no writ). Arlene has failed to show that the trial court abused its discretion in dividing the household furnishings. Her third point of error is overruled.

In the partnership's cross-point one, it argues that the trial court erred in finding that the evidence failed to rebut the presumption that the furnishings belonged to the community and erred in awarding Arlene the furnishings listed in part II of exhibit A to the decree of divorce. The partnership attacks the trial court's find-

ings as erroneous in that the unrefuted evidence establishes that the furnishings belong to the partnership and, furthermore, as a matter of law one cannot make a gift of property to the community estate. For the reasons given below, we hold that the trial court erred in ruling that the evidence failed to rebut the community presumption.

Woody testified that the partnership purchased the furnishings before the marriage, that the partnership owned all the furnishings, and that he and Arlene moved the furnishings from two houses owned by the partnership into the house on Bonnard Drive. Arlene agreed that the partnership had owned the furnishings, but she explained that Woody told her that whatever furnishings they moved into the Bonnard Drive house would become part of their community estate and that she understood Woody to mean that the furnishings would become hers and his jointly. Woody never denied making these statements to Arlene. There is also evidence that the partnership continued to carry the furnishings as an asset on its books and records.

Two possible scenarios exist. First, the partnership merely lent the furnishings. Second, the partnership made a gift of the furnishings. However, if the partnership intended a gift to the community, as Arlene contends, a gift to the community does not result; rather, when a third party attempts to make a gift to the community estate, the gift vests in each marital spouse, both taking a one-half undivided interest in the subject matter of the gift as his or her separate property. *McLemore v. McLemore,* 641 S.W.2d 395, 397 (Tex.Civ.App.—Tyler 1982, no writ); *Ramsower v. Pieper,* 114 S.W.2d 1188 (Tex.Civ. App.—Austin 1938, no writ) (applied to gift of personal property). Consequently, under either scenario, *the furnishings do not become community property.* The evidence is sufficient to rebut the presumption that the furnishings were community property. We sustain the partnership's cross-point one in this regard.

However, the partnership contends that we should render judgment declaring that it owns the furnishings. We overrule this contention. Although we have determined that the furnishings do not belong to the community, the question remains whether the partnership lent or gave the furnishings to Arlene and Woody. As the evidence is conflicting, the trial court is the proper court to resolve this question of fact. We remand this issue to the trial court for its determination.

## IV.

### THE MERCEDES

In her fourth point, Arlene contends that there is no evidence to support the judgment of the trial court that only $5,500 represents the value of the Mercedes wrongfully taken by Woody from Arlene's possession. The partnership maintains that it owned the Mercedes prior to the parties' marriage and that Woody permitted Arlene merely to use the Mercedes. Woody denies giving Arlene the car. The trial court decided *sua sponte* that Woody gave Arlene a usufruct that was her sole and separate property and that Woody wrongfully terminated her usufruct. Woody brings a cross-point wherein he argues that the trial court erred in finding a usufruct. In the alternative, the partnership and Woody argue that if Arlene did have a usufructuary right that Woody wrongfully terminated, then the trial court correctly found that Woody should pay Arlene only $5,500 in damages for its wrongful termination.

No usufruct is involved in the present case. A usufruct is the right of using and enjoying and receiving the *profits* of property that belongs to another, and a usufructuary is a person who has the usufruct or right of enjoying anything in which he has no property interest. *In re Adjudication of the Water Rights of the Upper Guadalupe Segment of the Guadalupe River Basin,* 642 S.W.2d 438, 444 (Tex.1982) (Texas Supreme Court relies upon *Sparks v. Spence,* 40 Tex. 693 (1874), and *Cartwright v. Cartwright,* 18 Tex. 626 (1857)); *Sparks,* 40 Tex. at 700; *Kelly v. Lansford,* 572 S.W.2d 369, 372 (Tex.Civ.

App.—Fort Worth 1978, writ ref'd n.r.e.) (court relies upon C.J.S.); 91 C.J.S. *Usufruct* 550 (1955) (C.J.S. relies upon *Sparks*, 40 Tex. at 700, and *Cartwright*, 18 Tex. at 628).

■■■■ Three types of usufructs exist. First, there are the *natural* profits produced by the subject of the usufruct. For example, the profits produced spontaneously by the earth or animals, such as timber, herbs, fruit, wool, milk, and the young of cattle are natural. Second, there are *industrial* profits, which are profits produced by cultivation, such as crops of grain. Third, there are *civil* profits, which are rents, freights, and revenues from annuities and from other effects or rights. *Cartwright v. Cartwright*, 18 Tex. 626, 628 (1857) (Texas Supreme Court relies upon *Cartwright* for another proposition in *Kelly v. Kelley*, 714 S.W.2d 303, 308 (Tex. 1986)). A usufruct is a right to profits or something tangible originating from other property. The right to drive the partnership Mercedes is not a tangible profit; therefore, Arlene's right to drive the partnership Mercedes is not a usufruct.

■■■■ Arlene argues simply that the unclaimed depreciation of the Mercedes was $10,833.33, not $5,500. She does not argue that the trial court erred in ruling that she received only a usufruct to the Mercedes and not the Mercedes itself. Because we hold that there is no usufruct and because Arlene does not complain of the trial court's implied finding that the partnership did not give the Mercedes itself to her, we hold that the Mercedes belongs to the partnership and that, therefore, when Woody retook possession of it, he did not commit conversion. Accordingly, we reverse the trial court's judgment ordering Woody to pay Arlene $5,500 for the wrongful termination of her usufructuary right in the Mercedes, and we render judgment that Arlene take nothing on her Mercedes claim.

## V.

### AWARD OF ATTORNEY'S FEES

■■■■ In Woody's final cross-point, he contends that the trial court erred in finding the agreed August 17, 1984, temporary orders were inapplicable to the attorney's fees of Arlene's attorney but were applicable to the attorney's fees of Woody's attorney. The trial court ordered Woody to pay $12,500 in attorney's fees to Arlene's attorneys. Woody contends that under the terms of the temporary order and as a matter of law Arlene's attorney's fees are her sole responsibility. The entry of a final judgment inconsistent in its terms with an earlier temporary order operates to set aside the temporary order. *Cf. Hill v. Robinson*, 592 S.W.2d 376 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r.e.) (final judgment and interlocutory judgment). The trial court may award attorney's fees as part of the division of the community estate. *See Murff v. Murff*, 615 S.W.2d at 699. Woody's cross-point is overruled.

■■■■ In his final cross-point, Woody also argues that there was no evidence that the $2,500 fee to Arlene's first attorney was reasonable and necessary and that there was no evidence that the $10,000 fee to Arlene's second attorney was reasonable and necessary. When deciding a "no evidence" question, appellate courts are to consider only the evidence and the inferences tending to support the finding and to disregard all evidence and inferences to the contrary. *Mitsubishi Aircraft International, Inc. v. Maurer*, 675 S.W.2d 286 (Tex.App.—Dallas 1984, no writ). Arlene's first attorney testified explicitly that the services she performed for Arlene were reasonable and necessary. Arlene's second attorney testified that his fees were reasonable and his services were necessary. Woody's final cross-point is overruled.

## CONCLUSION

Regarding Arlene's first point of error, which complains of the denial of her reimbursement claims, we affirm the trial court's denial of Arlene's claim for reimbursement for gifts to Woody's daughter and grandson. We reverse the trial court's denial of Arlene's claim for reimbursement to the community for $125,375.50 used to pay Woody's 1982 income tax and remand

**600**

this claim to the trial court for its reconsideration in the light of this opinion.

In point of error two, Arlene contends that the trial court improperly characterized the LTC debts, including those incurred after June 25, 1984, as her separate obligation. We reverse the trial court's determinations that the LTC debts were Arlene's separate debts.

Regarding the furnishings, the subject of Arlene's third point of error and the partnership's first cross-point, we reverse the trial court's treatment of the furnishings as community property. We remand the matter of the furnishings to the trial court for it to determine whether the partnership lent or gave the furnishings to Arlene and Woody.

Arlene's fourth point of error and Woody's first cross-point address the trial court's ruling that Woody wrongfully terminated Arlene's usufructuary right to the Mercedes. We reverse the trial court's judgment awarding Arlene $5,500 for the wrongful termination of her usufructuary right in the Mercedes, and we render judgment that Arlene take nothing on her Mercedes claim. We overrule Woody's second cross-point, which attacks the trial court's award of Arlene's attorney's fees.

Because the trial court mischaracterized Woody's partnership distributions as his separate property, the LTC debts as Arlene's separate liability, and the furnishings as community property, we reverse and remand the entire property and debt division, including the award of attorney's fees incident thereto, to the trial court for its redivision in light of this opinion. *McKnight v. McKnight*, 543 S.W.2d at 868.