**Affirmed and Memorandum Opinion filed June 28, 2018.**



**In The**

# Fourteenth Court of Appeals

---

**NO. 14-17-00293-CV**

---

**BRIAN TERRY MILLER, Appellant**

**V.**

**LINDA HILL MILLER, Appellee**

---

**On Appeal from the 169th District Court
Bell County, Texas
Trial Court Cause No. 258,387-C**

---

## M E M O R A N D U M   O P I N I O N

Linda Hill Miller (Linda) and Dr. Brian Terry Miller (Terry) had been married for forty-three years when Linda filed for divorce. After a bench trial, the court granted the divorce on the ground of insupportability and divided the couple's property and debts. The court also found that Terry committed fraud on the community and that the value owed to the community estate was $189,672.34. After reconstituting the community estate, the court valued the community estate at $7,621,044.80. The court awarded 49.28% of the community estate to Linda and

50.72% to Terry. On appeal, Terry contends that the trial court abused its discretion by recognizing a fraud on the community claim, arbitrarily reconstituting the community estate absent evidence of damages, ordering a business not a party to the divorce to pay Linda, and making a grossly disproportionate property division in a no-fault divorce. We affirm.

## I. FACTUAL BACKGROUND

Terry and Linda Miller were married in 1969 and had three children, all of whom were adults at the time of the divorce. Terry is a licensed and practicing physician. Beginning in 2005 or 2006, Linda worked at Terry's medical practice, the Central Texas Allergy & Asthma Clinic (the Clinic).

In 2007, the Millers embarked on a business plan to increase the size of their real estate holdings. In so doing, the Millers accumulated a significant amount of community property and debt associated with that property. The Millers maintained a bank account for their real estate investments known as the "real estate account" that was separate from their personal checking account and the Clinic account. Most of the Millers' income, however, came from the Clinic.

The Clinic had locations in several Texas cities, at times including Killeen, Georgetown, Cedar Park, Round Rock, and South Austin. Some of the Clinic's locations leased their buildings from BTM Medical Properties, LLC, a company owned by Terry and Linda. Another clinic leased its location from 103-109 Bell Blvd, LLC, a company in which Terry owned a 50% interest. The other members in 103-109 Bell Blvd were Kota and Uday Reddy, who together owned a 40% interest, and Terry's close personal friend and long-time neighbor, Hubert "Bud" Kott, who owned a 10% interest. Terry made all decisions and handled all business dealings with Kott and the Reddys; Linda had no business dealings with either Kott or the Reddys.

2

Terry also invested in real estate unrelated to clinic business. Terry and Kott formed MK Developers, LC, which invested in several commercial properties and land. Terry and Kott each owned a 50% interest in MK Developers, but Kott managed its daily operations. Terry and Kott also participated with several other individuals in Bar Seven Partners LP, a partnership that owned a tract of land divided into residential lots for resale and development. Kott was the managing partner of Bar Seven. Through BTM Medical Properties, Terry and Linda also purchased a commercial building located at 2014 W. Pecan Street in Pflugerville for rental to business tenants.

In July 2010, Terry suffered a massive stroke that left him unable to work for a substantial period of time. Terry was hospitalized for eight days before being transferred to a rehabilitation facility and later a nursing home. In May 2011, Terry returned to the marital residence. Because Terry was still unable to care for himself, Linda became his full-time caregiver. Linda found caring for Terry to be physically demanding and exhausting. In addition, the relationship between Linda and Terry began to deteriorate after Terry returned home. According to Linda, Terry became withdrawn and verbally abusive, frequently making critical or demeaning comments to her.

Linda was not actively involved in Clinic operations at the time of Terry's stroke. With the assistance of family members, Linda made the decision to sell a condominium the Millers owned in South Padre Island for $275,000.00 to cover their expenses. Linda also decided to suspend the Clinic's payment of salaries to the Millers and other family members who were on the Clinic's payroll because the Clinic's income decreased during Terry's absence.

The Clinic's long-time office manager, Geralyn Hall, made the primary decisions concerning the daily management of the Clinic's five locations while Terry

3

was recovering. At some point, Terry gave Hall a financial power of attorney that authorized Hall to access the Millers' real estate account and to conduct financial transactions relating to the Millers' real estate holdings. Terry also instructed Hall to not pay the rental obligations of clinics that were leasing property from BTM Medical Properties, which was solely owned by the Millers, but to continue paying the rental obligations of clinics that were leasing property that was independently owned or jointly owned with others.

Linda, overwhelmed by the demands of caring for Terry and their increasingly deteriorating relationship, attempted suicide. Shortly after that, in July 2012, Linda filed for divorce.

Prior to trial, Kott was indicted for misappropriating funds from a former employer. Bar Seven was then reorganized as Cactus Creek, LLC, and Kott was removed as manager. Despite the indictment, Terry continued to trust Kott with the management of MK Developers.

A non-jury trial was held over twelve days spanning nearly year—from June 3, 2015, to May 18, 2016—during which time changes in the community estate required that valuations be updated and proposed property divisions be revised. On December 20, 2016, the trial court signed the final decree of divorce. Terry filed a motion for new trial. After a hearing, the motion was denied by written order.

At Terry's request, the trial court filed findings of fact and conclusions of law. In its findings, the trial court took into consideration the following factors in making its determination of a just and right division of the community estate:

A. [Linda] has little or no future earning capacity. When she did work during the marriage, she worked in the office of [Terry].

B. [Linda] suffers from severe depression. Shortly before filing the divorce, [Linda] purposely overdosed on pills and then called for medical assistance.

4

C. [Linda] appeared frail and meek throughout the trial.

D. [Linda] was age 69 at the time of [sic] the divorce was granted.

E. [Terry] was an obstructionist during the discovery process. He failed to follow Court orders and his conduct delayed and prolonged the trial of this case.

F. At times during the divorce, [Terry] failed to pay Court ordered temporary support to [Linda]. For a period during the pendency of the divorce, [Terry] permitted his office to discontinue health insurance on [Linda].

G. During the pendency of the divorce, [Terry] gifted airline miles to his children and employees without the knowledge or consent of [Linda].

H. [Terry] is a licensed and practicing physician. He has the ability to continue to earn a substantial income post[-]divorce. During the divorce, even when [Terry] did not work full time, his clinics generated substantial income, and they should continue to do so in the future.

I. The property was divided in a manner so as to keep [Terry's] medical practice intact. [Terry] was awarded the real estate where his clinics operate so as not to disturb his practice or to require him to either negotiate leases with [Linda] or move his clinics to new locations.

J. The property was divided in a manner so that [Terry] was awarded the property that was jointly owned with others.

* * *

P. [Linda] was reluctant to enter into business deals where large sums of money were owed and felt pressured by [Terry] to sign personal guarantees.

Q. [Linda] was primarily awarded property with little risk, such as cash and retirement accounts.

R. [Terry] was awarded the property with mortgages. [Terry] has the income and earning potential to service the debt associated with the property awarded to him without having to deplete his assets.

S. [Terry] has the business experience to actively participate in decisions regarding property jointly owned with others.

The trial court also found that Terry committed fraud on the community and

reconstituted the community estate based on the following considerations:

> [Terry] committed actual or constructive fraud on the community. The Court further finds that the community estate should be reconstituted to the value that would exist if an actual or constructive fraud had not occurred. The Court further finds that value owed to the community estate is $189,672.34. The Court reduced the value of the reconstituted estate to $189,672.34. [Terry] had use and control of $476,016.59 in cash during the pendency of the divorce. This cash, which was generated by community assets, was acquired and spent by [Terry] without the knowledge or consent of [Linda]. In reducing the value of the reconstituted estate, the Court considered payments by [Terry] for his medical bills, the cost of his care by Visiting Angels, preservation of the community estate, and remodeling of community property.

The court determined that the value of the community estate was $7,621,044.80. The court awarded 49.28% ($3,755,571.40) of the community estate to Linda, and 50.72% ($3,865,473.40) to Terry.

Terry appealed the trial court's judgment to the Austin Court of Appeals, and the case was transferred to this court.[1]

## II. STANDARD OF REVIEW

In a divorce, the trial court divides the estate of the parties "in a manner that the court deems just and right." Tex. Fam. Code § 7.001. On appeal, we review the trial court's division of community property for an abuse of discretion. *Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981); *Iliff v. Iliff*, 339 S.W.3d 126, 133 (Tex. App.—Austin 2009), *aff'd*, 339 S.W.3d 74 (Tex. 2011); *Knight v. Knight*, 301 S.W.3d 723, 728 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Legal and factual sufficiency are relevant factors, rather than independent bases for reversal, in

---

[1] Because of the transfer, we must decide the case in accordance with the Austin Court of Appeals' precedent if our decision otherwise would have been inconsistent with that court's precedent. *See* Tex. R. App. P. 41.3.

determining whether the trial court abused its discretion. *Iliff*, 339 S.W.3d at 134.

A trial court's division may take into consideration a variety of factors in making a just and right division of property. *Schlueter v. Schlueter*, 975 S.W.2d 584, 589 (Tex. 1998); *Murff*, 615 S.W.2d at 799. Every reasonable presumption should be resolved in favor of the trial court's proper exercise of its discretion in dividing the parties' property. *Zieba v. Martin*, 928 S.W.2d 782, 791 (Tex. App.—Houston [14th Dist.] 1996, no writ). In making the determination of a just and right division, the trial court is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Iliff*, 339 S.W.3d at 138 (citing *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986)). The trial court is free to accept or reject the testimony of each witness in whole or in part and to resolve any inconsistencies in the testimony. *Id.*

To disturb a trial court's division of property, the appellant must show that the trial court clearly abused its discretion by making a division that is manifestly unfair. *See, e.g.*, *O'Carolan v. Hopper*, 414 S.W.3d 288, 311 (Tex. App.—Austin 2013, no pet.); *Evans v. Evans*, 14 S.W.3d 343, 345–46 (Tex. App.—Houston [14th Dist.] 2000, no pet.). The trial court's ultimate division need not be equal as long as it is equitable. *O'Carolan*, 414 S.W.3d at 311. The trial court does not abuse its discretion when it bases its decision on conflicting evidence or when some evidence of a probative and substantive character exists to support the division. *Iliff*, 339 S.W.3d at 134; *Zieba*, 928 S.W.2d at 787.

In an appeal after a bench trial in which the trial court files findings of fact and conclusions of law, we review the challenged findings for legal and factual sufficiency. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Iliff*, 339 S.W.3d at 134. When findings of fact are filed and unchallenged, they are binding on an appellate court unless the contrary is established as a matter of law or if no evidence

supports the finding. *McGalliard*, 722 S.W.2d at 696.

A legal sufficiency challenge will be sustained when the record discloses: (a) a complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014). In determining whether there is legally sufficient evidence to support the finding under review, we examine the record for evidence and inferences that support the challenged finding, considering evidence favorable to the finding if a reasonable factfinder could, and disregarding evidence contrary to the finding unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827–28 (Tex. 2005).

We will not substitute our judgment for that of the factfinder if the evidence falls in the zone of reasonable disagreement. *Id.* at 822. If there is any evidence of probative force to support the finding—i.e., more than a scintilla—we will uphold the finding and overrule the legal sufficiency challenge. *See Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003) (per curiam).

In conducting a factual sufficiency review, we must consider and weigh the entire record. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). We may set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* at 407.

### III. ANALYSIS

On appeal, Terry contends that the trial court abused its discretion by recognizing a fraud on the community claim, arbitrarily reconstituting the community estate absent evidence of damages, ordering a business not a party to the

divorce proceeding to pay Linda, and making an unequal property division in a no-fault divorce. We address each issue in turn.

## A.     The Trial Court's Finding of Fraud on the Community

In his first issue, Terry contends that the trial court abused its discretion by recognizing a fraud on the community claim because Linda's claim was not supported by legally and factually sufficient evidence. Within this issue, Terry makes five complaints: (1) the presumption of fraud on the community never arose because the community character of the property never changed; (2) the disposition of community property was fair to Linda; (3) no fiduciary duty existed between Terry and Linda during the divorce; (4) Linda was uninformed by personal choice in the matters of the community estate; and (5) the community estate remained monetarily whole.

### 1.     The Law Pertaining to Fraud on the Community

A fiduciary duty exists between a husband and a wife as to the community property controlled by each spouse. *Puntarelli v. Peterson*, 405 S.W.3d 131, 137 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Zieba*, 928 S.W.2d at 789. The breach of a legal or equitable duty that violates this fiduciary relationship is called a fraud on the community, a judicially created concept based on the theory of constructive fraud. *Zieba*, 928 S.W.2d at 789. No dishonesty of purpose or intent to deceive must be established; such proof of subjective intent is only required for actual fraud on the community, as opposed to constructive fraud on the community. *Puntarelli*, 405 S.W.3d at 138.

Historically, Texas has recognized the concept of fraud on the community as "a wrong by one spouse that the court may consider in its division of the estate of the parties and that may justify an unequal division of the property." *Schlueter*, 575

9

S.W.2d at 588. It is not an independent tort, but a means of redress for a deprivation of community assets to be considered as part of a just and right division of the community estate. *See id.* at 589.

A presumption of fraud on the community arises when one spouse disposes of the other spouse's one-half interest in community property without the other's knowledge or consent. *In re Marriage of Walzel*, No. 14-16-00637-CV, 2018 WL 614767, at *3 (Tex. App.—Houston [14th Dist.] Jan. 30, 2018, no pet.) (mem. op.); *Wheeling v. Wheeling*, No. 08–15–00064–CV, 2017 WL 192912, at *6 (Tex. App.— El Paso Jan. 18, 2017, no pet.); *Puntarelli*, 405 S.W.3d at 137–38. Once the presumption arises, the burden of proof then shifts to the disposing spouse to prove the fairness of the disposition of the other spouse's one-half community ownership. *Walzel*, 2018 WL 614767, at *3; *Puntarelli*, 405 S.W.3d at 138.

Since 2011, section 7.009 of the Texas Family Code has provided a statutory remedy for fraud on the community. *See* Tex. Fam. Code § 7.009. Under section 7.009, if the trier of fact determines that a spouse has committed actual or constructive fraud on the community estate, the court shall: (1) calculate the value by which the community estate was depleted as a result of the fraud on the community and calculate the amount of the reconstituted estate; and (2) divide the value of the reconstituted estate between the parties in a manner the court deems just and right. *Id*. § 7.009(b).

The reconstituted estate represents "the total value of the community estate that would exist if an actual or constructive fraud on the community had not occurred." *Id*. § 7.009(a). In making a just and right division of the reconstituted estate, the trial court "may grant any legal or equitable relief necessary to accomplish a just and right division." *Id*. § 7.009(c). The court may grant the wronged spouse "an appropriate share of the community estate remaining after the actual or

10

constructive fraud on the community," award a money judgment in favor of the wronged spouse, or award "both a money judgment and an appropriate share of the community estate." *Id*.

## 2. Application of the Law to Terry's Complaints

### a. Did Linda present legally sufficient evidence to cause the presumption of constructive fraud to arise?

Terry first contends that the presumption of constructive fraud never arose because Linda presented no evidence that the community character of the property ever changed. According to Terry, no presumption of constructive fraud arose because community funds were merely transferred to various entities within the community estate for the purpose of maintaining and preserving the community estate. *See Knight,* 301 S.W.3d at 731 (stating that constructive fraud arises when one party "disposes" of community property without the other's knowledge or consent); *In re Marriage of Notash*, 118 S.W.3d 868, 873 (Tex. App.—Texarkana 2003, no pet.); *see also In re Marriage of DeVine*, 869 S.W.2d 415, 423 n.11 (Tex. App.—Amarillo 1993, writ denied).[2] Therefore, Terry argues, the evidence is legally insufficient to support the trial court's finding of constructive fraud and the trial court abused its discretion in recognizing Linda's constructive fraud claim.

In support of his contention, Terry cites to his testimony that funds from the Clinic were periodically deposited into the real estate account or his personal account to pay the ongoing loan obligations of the real property associated with the community property business, each of which was held in a partnership. Terry also

---

[2] Although not discussed by the parties, we note that in *Giesler v. Giesler*, the Austin Court of Appeals held that no waste of community funds occurred when evidence conclusively showed that the husband's use of proceeds from selling community assets was done for community purposes or did not deplete community assets. *See* No. 03-08-00734-CV, 2010 WL 2330362, at *4 (Tex. App.—Austin June 10, 2010, no pet.) (mem. op.).

11

points to his testimony that copies of some checks and deposit slips showed that distributions he received from Bar Seven and Cactus Creek were accounted for and were applied to attorney's fees, Linda's $5,000.00 per month spousal support, and preserving and maintaining the individual clinics. Thus, Terry argues, the evidence shows that community funds were merely transferred to various entities within the community estate to maintain and preserve the community estate, and not to hide or spend down the community estate as Linda alleged.[3]

Terry acknowledges, however, that a finding of constructive fraud can be supported not only by evidence of specific transfers or gifts of community assets outside the community, but also by evidence that community funds are unaccounted for by the spouse in control of those funds. *See Walzel*, 2018 WL 614767, at *4; *Wheeling*, 2017 WL 192912, at *6; *Puntarelli*, 405 S.W.3d at 139–40; *Zieba*, 928 S.W.2d at 789–90. At trial, Linda argued that Terry had use and control of $476,016.59 in cash that was generated by community assets and was spent by Terry without Linda's knowledge or consent based on the following distributions:

- $225,000.00 received from Bar Seven and Cactus Creek in 2014;
- $118,000.00 in securities cashed in from a USAA brokerage account;
- the sale proceeds from three small properties in Lampasas totaling $13,672.00;
- $5,000.00 Terry received from MK Developers while the divorce was pending;
- $84,344.59 Terry liquidated from the 2401 W. Pecan Street bank account;
- $25,000.00 Terry received from Bar Seven in 2013;
- $4,000.00 loaned to a clinic employee; and

---

[3] For example, Terry testified that when the partnerships owned solely by the Millers forgave rental obligations of the Clinic, the Millers were essentially forgiving their own obligations for their clinics at their properties.

- $1,000.00 in scholarships paid by the Clinic.

Of this amount, the court found that the value owed to the community estate was $189,672.34. The trial court does not specify the basis for this amount, nor do the parties suggest how this amount could have been determined.

The majority of Terry's discussion of the evidence focuses on the distributions from Bar Seven and Cactus Creek. Terry does not discuss the other distributions Linda identifies except to assert that Linda did not dispute that the majority of the distributions from the business entities in which Terry participated went to preserve the community estate. Terry acknowledges, however, that $25,000.00 in distributions from Cactus Creek were not directly accounted for by evidence of transfers between the real estate account and the Clinic account. He also acknowledges that Linda contested whether at least $100,000.00 in distributions from the various entities were used to preserve the community estate.

The evidence at trial showed that Terry failed to account for significant distributions that were unaccounted for or were spent for non-community purposes. Among other things, Terry admitted advancing or loaning $10,000.00 to Kott during the divorce with no formal agreement for repayment. Terry also admitted receiving $84,344.59 from the 2401 W. Pecan Street bank account, but he could not say "what it specifically went for." Terry also testified that he advanced or loaned $81,700.00 to 103-109 Bell Blvd for a build-out on the property without making any agreement with the other co-owners, Kott and the Reddys, to repay Terry for his use of community funds to cover their respective shares of the loan. In addition, the Clinic's office manager, Geralyn Hall, testified that the Clinic regularly transferred money to the real estate account to pay the entirety of the monthly payment on the bank loan on the 103-109 Bell Blvd property, but she was unaware of any contributions by Kott or the Reddys to this monthly payment.

13

It is undisputed that despite Kott's indictment for misappropriating funds from a former employer, Terry continued to trust Kott with the management of MK Developers, a company Terry valued at over $1 million.[4] Terry testified that he relied on Kott to prepare the balance sheet for MK Developers and he allowed Kott to buy and sell properties without informing him. Terry also testified that Kott received distributions from MK Developers but Terry did not. Terry stated that he did not ask for distributions because he was not sure the company could afford to make distributions to both of them, but the trial court could have concluded that Terry wanted to hold any distributions due to him until after the divorce.[5]

The evidence also showed that the distributions Terry received from Bar Seven and Cactus Creek did not go directly to the Clinic account. Instead, they were first deposited in the real estate account or Terry's personal account, where Terry admitted that he had discretion over when and how to use them. Terry also admitted that the amounts of incoming distributions and outgoing payments for community purposes did not always coincide. Additionally, Terry acknowledged that he sometimes received checks from the Clinic for repayment of loans he had made to the Clinic, and he admitted that he took loan repayments instead of catching up on contributions to the parties' retirement accounts as ordered or paying the parties' delinquent taxes. Terry also confirmed that he gave out two $500.00 scholarships on

---

[4] The trial court valued the Millers' 50% interest in MK Developers at $471,302.00 after subtracting liabilities from fair market value. Terry does not challenge this valuation on appeal.

[5] Terry also testified that during the marriage he had invested with a partner in a company called HMH Construction. According to Terry, HMH Construction had been liquidated several years ago while owing the community estate $64,000.00 for equipment the Millers had purchased for the company's use. When shown the company's 2013 tax return, Terry denied being aware that the company was an ongoing concern and denied receiving any compensation from it, even though his partner at HMH Construction was also one of Terry's partners in Bar Seven and Cactus Creek. Nor could Terry explain why that partner was not directing funds to be paid to Terry out of his distributions from Bar Seven and Cactus Creek for the debt owed to the Millers.

behalf of the Clinic.

Hall had managed the Clinic bank account since 2006. After Terry's stroke and the divorce, Hall obtained access to the Millers' real estate account, Terry's personal account, and some of the property accounts. Hall regularly moved money from one account to another to cover the Clinic's financial obligations and the Millers' real estate obligations. Despite her knowledge of the Clinic's business and the Millers' investments, Hall was unable to corroborate several of Terry's general assertions concerning his use of community funds for community purposes. For example, Hall was unaware that Terry had cashed in securities totaling $118,000.00 and did not know what he did with the money.[6] Nor could Hall say what happened to the money Terry received for the sale of the three small properties in Lampasas. And while Hall stated that the $4,000.00 loan to a Clinic employee had been repaid, she admitted that she had not provided the Clinic's bank records to document the alleged repayment.

Hall also confirmed that she periodically deposited money from the Clinic account into Terry's personal account for repayment of loans ostensibly made by the community to the Clinic, but she could not definitively say how much of the $225,000.00 distributed from Cactus Creek in 2014 was loaned to the Clinic.[7] Hall also estimated that in 2010, before Terry's stroke, the Clinic probably owed the Millers over $100,000.00, and that since Linda filed for divorce, Terry has loaned the Clinic another $100,000.00. Hall stated that the loans to the Clinic were not

---

[6] Terry testified that he used the money from the sale of the securities to pay for medical care provided by Visiting Angels after his stroke. The trial court's findings reflect that the trial court took such payments into consideration, along with other factors, in reducing the reconstituted the estate.

[7] Hall testified that of the $225,000.00 Terry received from Cactus Creek in 2014, she "seem[ed] to remember" that about $45,000.00 went toward attorney's fees, and "at least" $50,000.00 was loaned to the Clinic.

15

documented in writing, but were always verbally authorized at Terry's instruction, and she did not know how much the Clinic owed the Millers. Hall maintained that the amount of the Clinic's loan payments to Terry was available in their QuickBooks accounting software, but the documentation was never produced to Linda.

Linda testified that Terry had control over all of the disputed money identified above. She also testified that Terry disposed of the money without her knowledge or consent, and that it had all been spent.[8] Prior to the divorce, Linda stated that she did not have much knowledge about Terry's business dealings. Linda explained that Terry went to great lengths to keep those business dealings from her because he thought she was too conservative about investing. Linda also testified that while the divorce has been pending, Terry had not been forthcoming in providing information concerning his business accounts and credit cards. Indeed, near the end of the trial, Terry revealed for the first time that in 2016, he charged payments totaling $75,000.00 to a previously undisclosed business credit card for which no statements were ever produced.

As the trier of fact, it was the trial court's role to judge the credibility of the witnesses, weigh the testimony, accept or reject any testimony, and resolve conflicts in the evidence. *See Murff*, 615 S.W.2d at 700; *Iliff*, 339 S.W.3d at 138. The trial court found, and it is undisputed, that during the divorce Terry failed to arrange and pay for real estate appraisals on the community real estate as ordered; failed to pay court-ordered temporary support to Linda at times; was an obstructionist during the discovery process and failed to follow court orders; and gifted airline miles to his children and employees without Linda's knowledge or consent during the pendency

---

[8] The voluminous record contains additional disputed transactions not discussed; these discussed represent most of the primary issues in contention during the trial and briefed by the parties.

of the divorce. The trial court, who had the benefit of observing Terry's conduct, character, and demeanor over the extended period, was not required to credit Terry's testimony that all community funds disposed of were used for community purposes.[9] Moreover, ample evidence exists to support the amount by which the trial court reconstituted the community estate, even discounting any Bar Seven and Cactus Creek distributions to the Clinic used for community purposes.

After considering the evidence and deferring to the trial court's credibility determinations, we conclude that the trial court reasonably could have found that Terry disposed of community funds without Linda's knowledge or consent, or that he failed to account for community property over which he had control, or both, causing the presumption of fraud on the community to arise and shifting the burden to Terry to show the fairness of the transactions. *See, e.g.*, *Puntarelli*, 405 S.W.3d at 140 (holding that husband's failure to disclose at least one bank account containing community funds and failure to account for or explain depletion of community funds in his control during pendency of divorce was sufficient to shift burden to him to establish fairness). Because the evidence is legally sufficient to shift the burden of proof to Terry, we turn to Terry's second complaint in which he contends that he rebutted the presumption of constructive fraud by establishing the fairness of the dispositions.

---

[9] In his brief, Terry cites to portions of Linda's testimony given in September 2015 for the proposition that Linda did not dispute that Terry used $681,000.00 from distributions and the sale of the Lampasas properties for community purposes. On May 18, 2016, the last day of trial, Linda explained that at her previous appearance she was feeling "very stressed and anxious" due to her anxiety disorder. As a result, she explained that she "was not herself" and just agreed to Terry's attorney's questions. The trial court, who had the benefit of observing Linda over the extended trial period, was similarly free to determine the credibility and weight to give her answers. *See Murff*, 615 S.W.2d at 700; *Iliff*, 339 S.W.3d at 138.

### b. Did Terry rebut the presumption of fraud on the community because the evidence showed that the disposition of the property was fair?

Terry next argues that even if the presumption of constructive fraud arose, he rebutted this presumption by establishing the fairness of the dispositions. Therefore, Terry asserts, the evidence is legally insufficient to support the trial court's finding of fraud on the community.

Terry maintains that most, if not all, of the community estate of $7,621,044.80 was his special community property, which gave him the right to control and dispose of it subject to his sole management. In the absence of fraud on the rights of the other spouse, a spouse has the right to control and dispose of community property subject to his sole management and it is not necessary that one spouse approve or agree with the dispositions made by the other spouse. *See Massey v. Massey*, 807 S.W.2d 391, 401–02 (Tex. App.—Houston [1st Dist.] 1991, writ denied, 867 S.W.2d 766 (Tex. 1993)); *Tabassi v. NBC Bank-San Antonio*, 737 S.W.2d 612, 617 (Tex. App.—Austin 1987, writ ref'd n.r.e.). Nevertheless, that spouse's disposition of his special community property must still be fair to the other spouse, and the managing spouse has the burden to show that the disposition of the property was fair. *Massey*, 807 S.W.2d at 402; *see Tabassi*, 737 S.W.2d at 617. The three primary factors for determining the fairness of the dispositions are: (1) the size of the property disposed of in relation to the total size of the community estate; (2) the adequacy of the estate remaining to support the other spouse after the disposition; and (3) the relationship of the parties involved in the transaction or, in the case of a gift, of the donor to the donee. *Puntarelli*, 405 S.W.3d at 138; *Zieba*, 928 S.W.2d 789; *Tabassi*, 737 S.W.2d at 617.

Terry argues that to the extent Linda claims he unwisely loaned or gifted sums of money to family friends, employees, or business partners, merely making good

18

faith, but unwise, investments of community funds, with loss to the community estate, does not constitute a fraud on the community. *See Andrews v. Andrews*, 677 S.W.2d 171, 175 (Tex. App.—Austin 1984, no writ). Terry does not identify any specific transactions he claims were merely unwise. Terry does argue, however, that even if some of his financial decisions and management of the community property were unwise, he presented evidence that after his stroke he: relied heavily on the advice of professionals and business partners to manage his community estate; made expenditures that were required to preserve the community estate and to cover the cost of his home care; and entered into valid transactions to maintain the community estate. In support of these assertions, Terry primarily relies on his own testimony. As discussed above, the credibility of Terry's testimony and the resolution of any conflicting testimony was for the trial court to determine. Moreover, we note that the trial court's finding of fact on constructive fraud reflects that the court considered Terry's medical bills, the cost of his home care, the preservation of the community estate, and the remodeling of community property, and the court reduced the amount sought by Linda from $476,016.59 to $189,672.34.

Terry also contends that he has established that his dispositions were fair to Linda's one-half community ownership because the size of the property disposed of in relation to the total size of the community estate was "inconsequential" as there was "more than 97% of a $7.6 million estate" remaining to support Linda. In support of this contention, Terry cites to *Marshall v. Marshall*, 735 S.W.2d 587 (Tex. App.—Dallas 1987, writ ref'd n.r.e.). In *Marshall*, the court affirmed the trial court's finding that no constructive fraud occurred where the husband gifted 11.7% of special community funds from a partnership to his daughter and grandson. *Id.* at 596–97. The court agreed with the trial court's finding that the husband did not intend to deceive the wife, and concluded that the gifts were fair to the wife because the gifts

19

were given to the "natural objects of [the husband's] bounty," there was no evidence that the wife had objected to the gifts, and the remaining community funds were sufficient to support the wife. *Id.*

Terry argues that the $189,672.34 in this case amounts to about 2.5% of the community estate—much less than the 11.7% found in *Marshall*. Unlike *Marshall*, however, the record in this case includes evidence that Terry advanced or loaned significant sums of community funds to his business partners—not his own children—without any written documentation or provisions for repayment. Terry also failed to account for funds appropriated from various community accounts. And unlike *Marshall*, it is undisputed that Linda had no knowledge of these transactions until after the money was spent. We conclude that on the facts of this case, the trial court reasonably could have concluded that Terry's disposal of community assets was not merely "unwise" and that the amount disposed was not "inconsequential." Therefore, legally sufficient evidence supports the trial court's implied finding that Terry's disposition of community assets totaling $189,672.34 unfairly deprived Linda of her interest in those funds. *See Massey*, 807 S.W.2d at 402–03.

### c. Is a constructive fraud claim barred as a matter of law because no fiduciary duty exists between a husband and wife after a divorce is filed and both parties are represented by counsel?

Terry next argues that during the pendency of the divorce, he did not owe Linda a fiduciary duty because the fiduciary duty between them terminated when Linda filed for divorce in July 2012 and both parties were represented by counsel. Terry maintains that he could not have committed fraud on the community because Terry did not owe Linda a fiduciary duty during that time.

In the context of divorce, courts have sometimes analogized a claim for breach of fiduciary duty to constructive fraud on the community and held that "[t]he

20

fiduciary duty arising from the marital relationship ceases in a contested divorce when the husband and wife each hire independent attorneys to represent them." *See Ricks v. Ricks*, 169 S.W.3d 523, 526 (Tex. App.—Dallas 2005, no pet.). Fraud on the community is not an independent tort, however, but is instead a remedy for a deprivation of community assets to be considered as part of a just and right division of the community estate. *See* Tex. Fam. Code § 7.009(b)–(c); *Schlueter*, 975 S.W.2d at 588; *see also* Tex. Fam. Code § 7.001 ("In a decree of divorce or annulment, the court shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage."); *Chu v. Hong*, 249 S.W.3d 441, 444–45 (Tex. 2008) (distinguishing personal injury claims, which are the separate property of each spouse and can be asserted between spouses as independent torts, from waste, fraudulent transfer, or other damage to community property, which are "claims belonging to the community" and thus "must be included in the trial court's just-and-right division of community property upon divorce").

In support of his argument, Terry cites several appellate court cases in support of the general proposition that the fiduciary duty arising from the marital relationship ceases in a contested divorce when the husband and wife each hire independent attorneys to represent them. All of these cases are easily distinguishable, however, because none of them hold that a claim for fraud on the community is barred as a matter of law if the wrongful disposition of community property occurs during the divorce proceedings.[10] Indeed, such a conclusion would deprive a wronged spouse

---

[10] *See, e.g., Boaz v. Boaz*, 221 S.W.3d 126, 133 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (holding wife failed to show extrinsic fraud in bill of review action based on allegation that husband misrepresented and failed to disclose assets on his inventory when husband owed no fiduciary duty to wife in contested divorce action and wife had opportunity to explore any claim of fraud on the community during the litigation because she was aware of the disputed assets); *Boyd v. Boyd*, 67 S.W.3d 398, 405 (Tex. App.—Fort Worth 2002, no pet.) (holding that even though fiduciary duty between spouses ceased during divorce, trial court did not err in finding

21

of the constructive fraud remedy at a time when that spouse's community property interest may be most vulnerable to wrongdoing. And, contrary to Terry's argument, courts have recognized fraud on the community when the wrongful disposition of community property occurred during the divorce. *See, e.g.*, *Everitt v. Everitt*, No. 01-11-00031-CV, 2012 WL 3776343, at *5–7 (Tex. App.—Houston [1st Dist.] Aug. 31, 2012, no pet.) (mem. op.) (affirming trial court's finding that husband committed constructive fraud by spending $249,970.56 of community property during divorce); *Hancock v. Hancock*, No. 2-06-376-CV, 2008 WL 2930586, at *6–8 (Tex. App.— Fort Worth July 31, 2008, no pet.) (mem. op.) (affirming trial court's finding that husband committed fraud on the community by "improperly disposing of certain community property during the pendency of the divorce").

Even if a spouse has no obligation to voluntarily make disclosures concerning marital property or other assets during a contested divorce in which both parties are represented by counsel, a party's duty to timely and properly comply with discovery requests and court orders remains. *See Everitt*, 2012 WL 3776343, at *4 (stating that the disposition of community property by either party above limits set by agreement or court order for a purpose not specifically authorized by the court "raises the presumption of constructive fraud"). In this case, it is undisputed that Terry repeatedly refused or failed to comply with discovery requests and court orders. We

mediated property settlement agreement unenforceable based on husband's failure to disclose substantial community assets contrary to agreement's full disclosure provision); *Parker v. Parker*, 897 S.W.2d 918, 924 (Tex. App.—Fort Worth 1995, writ denied) (reversing award of contractual alimony based on claim that husband breached fiduciary duty during settlement negotiations when both parties were represented by counsel and neither party was present), *overruled on other grounds*, *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41 (Tex. 1998); *Bass v. Bass*, 790 S.W.2d 113, 119 (Tex. App.—Fort Worth 1990, no writ) (rejecting wife's argument that husband owed fiduciary duty to assert an affirmative defense to payment of one of wife's contingent liabilities arising out of property settlement agreement rather than to pay off wife's obligation based on oral guaranty and seek repayment from wife in post-divorce enforcement action);

22

decline to hold that as a matter of law, a trial court is precluded from considering fraud on the community that occurs during the pendency of a divorce in which both parties are represented by counsel.

### d. Did the trial court err in finding constructive fraud when Linda was uniformed by personal choice in the matters of the community estate?

Terry next argues that Linda testified at trial that she did not ask questions of Terry regarding the businesses or the finances and she did not take an active interest in many of the parties' community property interests, even though she had access and means to learn about and participate in the management of the parties' community property interests. Because Linda was "uniformed by personal choice in the matters of the community estate," Terry argues, Linda's lack of knowledge or consent was her fault alone, and therefore the trial court erred in finding constructive fraud.

Terry does not articulate whether he is presenting an insufficiency complaint or a legal issue, and he does not cite any authorities to support his argument. As an initial matter, the record reflects that the degree to which Linda desired or was permitted to inquire into the businesses and finances was disputed, and as such was a matter for the trial court to resolve.

Further, as we have discussed, even when a spouse has sole management and control over community property, that spouse's disposition of his special community property must be fair to the other spouse. *See, e.g.*, *Everitt*, 2012 WL 3776343, at *3; *Massey*, 807 S.W.2d at 402. For the presumption of constructive fraud to arise, one spouse need only dispose of the other spouse's interest in community property without the other's knowledge or consent. *See Everitt*, 2012 WL 3776343, at *3. The presumption may arise even when the other spouse has knowledge of the disposition,

so long as she did not also consent to the disposition. *Id.* We are aware of no Texas case holding that the law imposes a requirement of diligence on the non-managing spouse, particularly when a relationship of trust and confidence exists between spouses as to that portion of the community property controlled by the managing spouse. *See id*.; *Massey*, 807 S.W.2d at 402; *see also S.V. v. R.V.*, 933 S.W.2d 1, 8 (Tex. 1993) (stating that "a person to whom a fiduciary duty is owed is relieved of the responsibility of diligent inquiry into the fiduciary's conduct"). We reject Terry's argument to the contrary.

### e. Did the trial court err by dividing a community estate that remained monetarily whole?

Lastly, Terry contends that the trial court abused its discretion when it arbitrarily and unreasonably reconstituted the community estate based on assets that were not lost and a community estate that remained whole.

If fraud on the community is found, the trial court may accomplish a just and right division by awarding the wronged spouse an appropriate share of the community estate remaining after the actual or constructive fraud on the community, a money judgment in favor of the wronged spouse, or both. *See* Tex. Fam. Code 7.009(c). When the community has been made monetarily whole, however, the trial court may not effect a disproportionate property division solely to make up for a formerly lost asset. *See Everitt*, 2012 WL 3776343, at *3.

Terry argues that he reduced the indebtedness of the community estate and increased the value of retirement funds available to the parties throughout the marriage and during the pendency of the divorce. In contrast, Terry asserts, Linda presented no evidence to demonstrate that Terry engaged in any action that was fraudulent or in breach of a fiduciary duty to her, and thus there was no financial injury to Linda. Terry also argues that although the community estate did not

advance significantly during the three years of the divorce proceeding, it did not decline significantly either, despite draws for various legal fees, medical bills, and court costs.

In support of his argument, Terry cites to his own testimony that he created a diversified community estate and, since his stroke, kept it stable; he continued to make consistent contributions to his and Linda's retirement accounts; and he has stabilized or grown physical assets. The trial court, however, was not required to accept Terry's self-serving testimony, particularly in light of the evidence already discussed. *See Murff*, 615 S.W.2d at 700; *Iliff*, 339 S.W.3d at 138. Moreover, we note that the trial court took into account Terry's preservation of community property, and after thoughtfully considering the extensive evidence presented, reduced the amount Linda sought by over $286,000.00.

We have held that the evidence discussed above is legally sufficient to support the trial court's finding of constructive fraud. Although none of Terry's arguments expressly encompass a factual sufficiency challenge, after considering and weighing the entire record, and deferring to the trial court's decisions concerning the weight and credibility of the witnesses and the resolution of conflicting evidence, we also hold that the trial court's finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Mar. Overseas Corp.*, 971 S.W.2d at 406–07. Accordingly, the trial court did not abuse its discretion in finding constructive fraud and dividing the Millers' community estate. *See Murff*, 615 S.W.2d at 698. We overrule Terry's first issue.

## B.    Evidence of Damages

In his third issue,[11] Terry contends that Linda failed to establish any damages

---

[11] In his second issue, Terry contends that the trial court abused its discretion in finding actual fraud; however, Linda concedes that the trial court made no specific findings of actual fraud,

caused by Terry's alleged fraud on the community. According to Terry, because no evidence of damages was presented at trial and the community estate remained monetarily whole, the evidence was legally insufficient to support the trial court's finding of constructive fraud, and therefore the trial court abused its discretion in recognizing Linda's fraud on the community claim.

Terry's argument echoes his earlier complaint that there can be no constructive fraud if the community estate remained monetarily whole. In this issue, however, Terry analogizes a fraud on the community claim to a claim for breach of fiduciary duty and actual fraud on the community to assert that the community must have sustained damages or injury. *See Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied); *Devine*, 869 S.W.2d at 421. Terry also argues that section 7.009(b) of the Family Code reflects an implicit requirement that the community estate be harmed in order for the trial court to "calculate the value by which the community estate was depleted as a result of the fraud on the community and calculate the amount of the reconstituted estate." *See* Tex. Fam. Code § 7.009(b)(1).

The crux of Terry's issue, however, is that the evidence is legally insufficient to support the trial court's finding of fraud on the community because the community estate remained monetarily whole—an argument we have already rejected. Even accepting for purposes of argument the premise that a wrongful depletion of community assets is analogous to damages, Terry points to no additional evidence to support his contention that the evidence is legally insufficient to show that the community estate was depleted or damaged. We therefore overrule Terry's third issue.

---

as the trial court found only that Terry "has committed actual or constructive fraud on the community." Therefore, we need not address this issue.

## C. The Award of $100,000.00 of Funds on Deposit in Clinic Account

In his fourth issue, Terry contends that the trial court erred by including in the final decree of divorce an order requiring the Clinic, which was not a party to the divorce, to pay Linda $100,000.00. According to Terry, he maintained at trial that the Clinic account was property belonging to the business and not an individual asset. Terry also asserts that the parties' business valuation expert testified similarly.

Two problems exist with Terry's argument. First, although Terry asserts that he argued at trial that an award of the Clinic's bank account funds exceeded the court's authority and he raised this issue again in his motion for new trial, the record does not support Terry's contention. Terry does not cite to any of the trial record, but does direct us to specific pages of the reporter's record of the hearing on the motion for new trial. We have reviewed the entirety of the hearing record and find nothing that would alert the trial court to a complaint that the court lacked authority to order the Clinic to pay Linda $100,000.00 from its account. The only reference to the Clinic is in the context of a discussion of the court's valuation of the various properties, in which Terry states: "There were very few that we disagreed on; i.e., the business — the Allergy & Asthma Clinic being one of those." This statement is not sufficiently specific to make the trial court aware of the complaint and the specific grounds Terry argues on appeal are not apparent from the context of the exchange. *See* Tex. R. App. P. 33.1(a)(1)(A).

Because Terry is arguing a new legal theory for deleting a portion of the community property awarded to Linda, rather than challenging the legal or factual sufficiency of the evidence, we conclude that Terry has failed to preserve this issue for appeal. *See* Tex. R. App. P. 33.1(d); *Watts v. Oliver*, 396 S.W.3d 124, 133 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("A complaint that the trial court misapplied the law must be raised in the trial court."); *Everitt*, 2012 WL 3776343,

at *6 (holding that legal arguments other than legal and factual sufficiency of the evidence were not preserved for appeal when not raised in the trial court).

Second, even if we liberally construe Terry's issue as a challenge to the legal sufficiency of the evidence, Terry does not direct this court to the evidence he contends shows that both Terry and the business valuation expert testified that the Clinic account was a business account, rather than an individual account in the names of the parties. Further, the complained-of provision in the divorce decree does not "order" the Clinic to do anything. The divorce decree merely reflects that the trial court awarded Linda to be paid an amount of money from "the funds on deposit" in the Clinic account as part of its community property division. It is undisputed that the Clinic was a community asset, and Terry does not challenge the trial court's fact finding that the Millers' community property included the Clinic. Nor does Terry cite to any authorities to support his contention that the trial court could not award Linda a portion of the funds on deposit in the Clinic account in its division of the community estate.

An appellant's brief must contain a clear argument for the contentions made, with appropriate citations to the record and to authorities. Tex. R. App. P. 38.1(i); *Melendez v. Exxon Corp.*, 998 S.W.2d 266, 280 (Tex. App.—Houston [14th Dist.] 1999, no pet.). It is Terry's responsibility to direct this court to the evidence upon which he relies to support his position. *See Thottam v. Joseph*, No. 01-13-00377-CV, 2015 WL 1632454, at *7 (Tex. App.—Houston [1st Dist.] Apr. 9, 2015, pet. denied) (mem. op.). This court has no duty to search a voluminous trial record to determine whether an assertion of reversible error is valid.[12] *See id*.; *Melendez*, 998 S.W.3d at 280. Terry's failure to cite relevant portions of the record and to cite

---

[12] Terry acknowledges that the reporter's record in the trial court "constituted 16 lengthy volumes."

relevant authorities waives his complaint. We overrule Terry's fourth issue.

**D.     The Unequal Division of the Estate**

Lastly, in his fifth issue, Terry contends that the trial court abused its discretion in making a grossly disproportionate property division in favor of Linda when no fault grounds were proven or found in the trial court's ruling.

In the trial court's findings of fact, the court stated that it was awarding 49.28% of the community estate to Linda and 50.72% to Terry. Nevertheless, Terry asserts that:

> The trial court's memorandum ruling and the financial values the court adopted from [Linda's] trial attorney's closing argument do not reconcile with the trial court's findings of fact and conclusions of law[,] nor does it reconcile with the court's announced percentages in his ruling on the motion for new trial. Reviewing the values compared to what was entered in the Final Decree of Divorce, the property division resulted in a 59–41 percent division in favor of [Linda].

Terry does not explain the basis of his conclusion that the trial court's division actually resulted in a 59–41 division.[13] Nor does he direct us to the specific valuations he is comparing or explain how they fail to reconcile.

It is not our duty to review the record, research the law, and then fashion a legal argument for an appellant when he has failed to do so. *Canton–Carter v. Baylor Coll. of Med.*, 271 S.W.3d 928, 931–32 (Tex. App.—Houston [14th Dist.] 2008, no pet.). Briefing waiver occurs when a party fails to make proper citations to authority or to the record or provide any substantive legal analysis. *See* Tex. R. App. P. 38.1(i); *Canton–Carter*, 271 S.W.3d at 931. Even though we are required to interpret

---

[13] To the extent Terry may be suggesting that the property division without the finding of fraud on the community results in a 59–41 division, we have concluded that the evidence is sufficient to support the trial court's finding; accordingly, we would reject such an argument.

appellate briefs reasonably and liberally, parties asserting error on appeal still must put forth some specific argument and analysis citing the record and authorities in support of their argument. *San Saba Energy, L.P. v. Crawford*, 171 S.W.3d 323, 338 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Accordingly, we conclude that Terry failed to adequately brief any argument in support of this issue, and so has waived the complaint. We overrule Terry's fifth issue.

## IV. CONCLUSION

We overrule Terry's first, third, fourth, and fifth issues, and do not address his second issue. We affirm the trial court's final decree of divorce.


/s/    Ken Wise
       Justice


Panel consists of Justices Boyce, Donovan, and Wise.